[Crim. No. 6631. In Bank. Aug. 9, 1960.]

THE PEOPLE, Respondent, v. JESSE EUGENE TROUT, Appellant.

578

Benjamin F. Marlowe for Appellant.

Stanley Mosk, Attorney General, Clarence A. Linn, Assistant Attorney General, Arlo E. Smith and John S. McInerny, Deputy Attorneys General, J. F. Coakley, District Attorney, Francis J. Vukota and Charles Michael Smith, Deputy District Attorneys, for Respondent.

GIBSON, C. J.—A jury found defendant guilty of robbery of the first degree and kidnaping for the purpose of robbery. Defendant's principal contention is that an oral confession which he gave to the police was involuntary and that the court therefore erred in receiving evidence on the subject.

On December 22, 1957, about 8 p. m., an armed man, subsequently identified as Allen Hecht, forced his way into the home of Blaine Groo, the manager of a market in Oakland. Hecht summoned a second gunman, whom he called "Ralph," and the two men compelled Mr. and Mrs. Groo to go with them to the market. On the way Hecht warned the couple not to cause any trouble at the store, stating that a third man would be in another car with a submachine gun. The men forced Groo to open two safes, took some money and checks,

and then locked him and his wife in a large refrigerator. It was 9 p. m. when the two men left, and the victims did not succeed in releasing themselves until about 4 o'clock the following morning. When they informed the police what had happened, they said that they did not get a good view of the man called "Ralph," but upon examining various pictures at the police station they identified Hecht as the other man.

Hecht was killed the day following the robbery while using a gun to resist arrest. A gasoline credit card and gasoline sales receipts bearing defendant's name were found in Hecht's apartment, and an automobile registered in defendant's name, the license number of which appeared on some of the sales receipts, was parked in front of the apartment house. In the glove compartment the police found a blackjack, a roll of tape, and a tube of grease paint. The police then went to defendant's home, which was a short distance away, arriving there about 10 or 11 p. m.

Eight officers entered defendant's home with drawn guns through an unlocked door. He and his wife were watching a television program, and their three small children were asleep in the bedrooms. The officers searched defendant for weapons, took his wife into another room, and questioned them separately about the crimes and their association with Hecht. Defendant denied committing the crimes, saying he knew nothing about them. He made conflicting statements as to when he had last seen Hecht and whether he had ever gone anywhere with him. Mrs. Trout said that she was at her church on the evening the crimes were committed. As to certain other matters she gave replies which were inconsistent. She first told the police that she had not seen Hecht on December 22 and then said that he had been at the house about 3 p. m. for a brief time. On being told that her husband said Hecht ate dinner with them, she admitted Hecht did but added that he left after dinner.

Sometime after midnight the Trouts were taken in different automobiles to the Oakland police station. Mrs. Trout gave a written statement to the police at 3 a. m. (December 24th) in which she said that Hecht had dinner at her home at about 5 p. m. on December 22, 1957, that she left the house at 5:30 to go to her church, and that she returned around 9 or 9:30. Defendant was first taken to a cell which had no sleeping facilities, and at 6 a. m. he was placed in another cell but was then unable to sleep because there was too much noise, and he did not have any breakfast. Beginning about 10

o'clock in the morning he was interrogated four times by Lieutenant H. W. Murray. Mrs. Trout was present on two or three of the occasions when defendant was being questioned. Twice between periods of interrogation Lieutenant Murray sent Mrs. Trout in to talk to defendant. At 3:30 that afternoon, defendant, in the presence of his wife and a stenographer, made an oral confession to Lieutenant Murray, stating that he drove with Hecht to Oakland before the Groos were kidnaped, acted as a lookout at the market, and picked up Hecht afterward at a prearranged location. He said that a third man was to help carry out the plan but that he had not seen him and did not know his identity. Immediately following the confession Mrs. Trout was released from custody. Later, after defendant had consulted an attorney, the police asked him to sign a transcript of his oral confession, and he refused to do so.

The testimony of defendant may be summarized as follows: He did not sign the confession because it was not true and because his attorney advised him that his wife "couldn't be picked up again." His knowledge of the details of the crimes had been obtained from newspaper accounts and from the police during interrogation. The police gave him to understand that his wife would be retained in custody until he confessed, and the only reason he made the confession was to secure her release. While he was at home the police told him that his wife could remain there if he would give them a statement, and, when he answered that he could not confess because he did not know anything about the crimes, one of the officers, whose name he did not know, asked him what manner of man he was to allow her to go to jail when all he had to do was confess. Shortly after he arrived at the police station his wife was crying and tried to sit near him but was forbidden to do so. During his interrogation by Lieutenant Murray the officer told him that Mrs. Trout should be at home with the children at "that particular time of the year," that she could go home immediately if he confessed, and that all he had to do was "come clean and confess, clear this thing up, and she could go home with the children." The first time Lieutenant Murray sent Mrs. Trout to talk to defendant, she was crying and told him she had been informed she could go home if he confessed. At the second visit she said that she had been taken home for a short while, that the baby cried for her when she left, and that she wanted to go home and "just couldn't bear it."

According to the testimony of Mrs. Trout, the police told her at her home on the night of December 23 that she would not have to be arrested if her husband would tell them what they wanted to know. At the police station Inspectors Kenneth North and Donald Richardson said that they did not want her there, that she belonged at home with the children, and that she could go home if her husband told them all he knew about what happened. Lieutenant Murray told her that she would be released if defendant confessed to the crime or a part of it and that when she would be released would depend entirely upon her husband. After she had been taken home for a brief visit and had held the baby, she conveyed "that message" to defendant.

Mrs. Trout's sister and an attorney employed to represent Mrs. Trout when she was in jail testified that Lieutenant Murray told them that when she would be released would depend entirely on defendant. Mrs. Trout's brother-in-law testified that Deputy Chief Rogers made the same statement to him.

Deputy Chief Rogers and Inspector Albert Zweigle, two of the officers who went to the Trouts' home on the night of the arrest, testified that they did not hear anyone ask defendant what manner of man he was to allow his wife to go to jail and that from the time they began working on the case they did not hear anyone who talked to defendant or his wife use words to the effect that she would be released if he confessed. Rogers denied making such a statement to Mrs. Trout's brother-in-law. The record does not show whether either Rogers or Zweigle was present at all times while other officers were with defendant or his wife at their home or whether they were present at the police station when Officers North, Richardson, or Murray assertedly made the statements attributed to them by the Trouts. The testimony of the officers on this subject, while incomplete, is that Rogers moved back and forth between the Trouts at the house, that Richardson was alone with Mrs. Trout when she gave her written statement at the police station, and that neither Rogers nor Zweigle was present at the time defendant confessed to Murray.

Inspectors North and Richardson were called as witnesses by the People but were not asked if they had made the statements which Mrs. Trout testified they made to her at the police station.

Lieutenant Murray testified that no promise of immunity

or reward had been made to defendant and that no duress, threats or undue influence had been used in obtaining the confession. He said that he did not tell anyone Mrs. Trout could go as soon as her husband confessed and that he had not used any words to that effect. When asked whether he reminded defendant of the fact that he had several little children and a wife who should be together on Christmas Eve, Murray said that he did not, although he acknowledged that to a similar question at the preliminary examination he had answered, "I just don't recall saying that. I might have said it." In response to an inquiry whether he told defendant that when his wife would be released would depend entirely upon him, the officer said that he had not done so "in those words." When asked in what words he "did mention this particular statement," he answered, "Mrs. Trout was a suspect in this case, as well as her husband. If the truth was brought out, if she wasn't involved, she wouldn't be there for five minutes. But up until this time there was reason to believe that she was also involved herself." In reply to a question as to whether he said to defendant that if he "came clean" or gave a statement his wife could go home, or words to that effect, the witness stated, "Well, I can't recall saying it in that manner," and then added, "As close as I can recall, I don't recall saying it." Upon being asked whether, before he sent Mrs. Trout in to see defendant, he told her that when she would be released would depend on defendant, Murray shook his head negatively and then said, "I don't recall saying that." The court informed him that defense counsel was entitled to an answer, and he replied, "Well, I didn't tell her that she could go when he told his part, no, sir. If she didn't belong there, she wouldn't be there for five minutes. Now up until this time we didn't know."

So far as appears, the police made no effort to verify the statements made to them by Mrs. Trout with respect to her activities on the night of the crimes. Defense counsel sought several times to ascertain whether such a check had been made, but the prosecution objected, and the objections were sustained. Mrs. Trout testified that her church, which was about a half mile from her home, was having a Christmas party on the evening in question, that when she finished dinner she drove to Kentfield to leave her baby with one of her sisters, that she went to the party with two of her children, another sister, and her mother, and that after the party, which ended about 8 or 8:30, she drove her mother to Kent-

field, went to her sister's house for the baby, and returned home at 9:30 or a little earlier.

Before a confession may be used against a defendant the prosecution has the burden of showing that it was voluntary and was not the result of any form of compulsion or promise of reward, and it is immaterial whether the pressure or inducement was physical or mental and whether it was express or implied. (*People* v. *Berve,* 51 Cal.2d 286, 290-291 [332 P.2d 97]; *People* v. *Jones,* 24 Cal.2d 601, 608 [150 P.2d 801]; *People* v. *Rogers,* 22 Cal.2d 787, 804-805 [141 P.2d 722]; *People* v. *Siemsen,* 153 Cal. 387, 394 [95 P. 863]; *People* v. *Speaks,* 156 Cal.App.2d 25, 36, 37 [319 P.2d 709]; *People* v. *Clark,* 55 Cal.App. 42, 45 [203 P. 781].) The use in a criminal prosecution of involuntary confessions constitutes a denial of due process of law under both the federal and state Constitutions. (*Payne* v. *Arkansas,* 356 U.S. 560, 561 [78 S. Ct. 844, 2 L.Ed.2d 975]; *People* v. *Berve,* 51 Cal.2d 286, 290 [332 P.2d 97].)

It is the duty of a reviewing court to examine the uncontradicted facts in order to determine independently whether a confession was voluntary. (*Stroble* v. *California,* 343 U.S. 181, 190 [72 S.Ct. 599, 96 L.Ed. 872]; *People* v. *Berve,* 51 Cal.2d 286, 290 [332 P.2d 97].) The testimony of defendant and his wife relating to statements made to them by the police is not contradicted in its entirety by the police officers, and insofar as it stands uncontradicted we may consider it in determining the admissibility of the confession. (*People* v. *Jones,* 24 Cal.2d 601, 610 [150 P.2d 801].) With reference to the conversations at the Trouts' home, only Deputy Chief Rogers and Inspector Zweigle out of the eight officers present testified as to whether statements amounting to coercion or inducement were made, and there is nothing to show that statements of this type, to which the Trouts testified, were not made by other policemen out of the hearing of these witnesses. As to the conversations at the police station, Mrs. Trout's testimony regarding the statements made by Inspectors North and Richardson stands uncontradicted. Although North and Richardson were called as witnesses, they were not asked whether they made such statements, it is not denied that they talked to her, and there is no showing that Rogers or Zweigle was then present. Lieutenant Murray, as we have seen, denied that he made statements to anyone to the effect that Mrs. Trout could go as soon as her husband confessed. However, he testified that he stated to defendant

in substance that Mrs. Trout was a suspect who would be released if it were shown that she was not involved, and, in view of the fact that the statement was made to a prisoner whose confession was being sought by the officer, it could have been understood as suggesting that defendant's wife would be released from custody upon his confession.

Irrespective of what words may or may not have been used by the police, the reasonable conclusion to be drawn from the undisputed facts is that the police held Mrs. Trout in custody for the purpose of securing a confession from defendant. She was placed under restraint as soon as the police entered her home, although they had no grounds for her arrest. The People do not claim that there were such grounds at the outset, but they assert that her inconsistent replies to questions asked at her home warranted suspecting her as a participant in the crimes and justified taking her into custody. We do not agree. Such inconsistent answers as she gave could well have been the result of the natural inclination of a wife to protect her husband, and her account of her own activities on the night of the crimes was consistent from the beginning and could easily have been checked by the police through independent investigation. There was no indication that a woman was involved in the crimes, and, to the contrary, the Groos had reported that the two kidnapers they saw were men and that Hecht in mentioning a third person in another car referred to a man.

Mrs. Trout was held in custody for more than 12 hours after giving her written statement at 3 a.m. and was released as soon as her husband confessed. She was brought into the room during several of Lieutenant Murray's interviews with defendant, including the one resulting in the confession, and on two occasions between interviews the officer sent her in to talk to defendant. It cannot reasonably be believed that, had she actually been suspected, the police would have sent her in to talk to defendant, thus giving them an opportunity to agree upon a story, or that she would have been released immediately following his confession. To the extent that the confession may be said to contain anything allaying the officers' asserted suspicion, it was to be expected that a husband would be anxious to shield his wife. In addition, the police were then, as before, in a position to establish by independent investigation the truth of Mrs. Trout's statements as to her whereabouts on the night of the crimes. At no time, so far as the record shows, was an effort made by the police to

conduct such an investigation even though, after taking Mrs. Trout to the police station, they had the entire morning and the early afternoon of December 24 available for that purpose. As we have seen, the People objected when defendant sought to elicit evidence on this extremely important aspect of the case. They do not claim that such an inquiry was made and have not advanced any explanation why the police did not make one if, as urged, Mrs. Trout was being held as a suspect rather than for the purpose of securing a confession from defendant.

Whether or not there were express threats or promises making Mrs. Trout's release from custody dependent upon defendant's confessing to the crimes, the undisputed facts discussed above show that such a threat or promise to defendant was implied. It should be noted in this connection that, when defendant's wife had been released and he had consulted an attorney, he refused to sign a transcript of his confession. We are satisfied that the confession resulted from improper pressure by the police and should not have been received in evidence. (See *People* v. *Matlock,* 51 Cal.2d 682, 697 [336 P.2d 505] [recognizing that a confession coerced by a threat to arrest a relative is involuntary].)

It is settled that, where an involuntary confession constitutes a part of the evidence before the jury and a general verdict is returned, a judgment of conviction cannot be allowed to stand even though there is sufficient evidence of guilt apart from the confession. (*Payne* v. *Arkansas,* 356 U.S. 560, 568 [78 S.Ct. 844, 2 L.Ed.2d 975] ; *People* v. *Berve,* 51 Cal.2d 286, 290 [332 P.2d 97] ; see *Stroble* v. *California,* 343 U.S. 181, 190 [72 S.Ct. 599, 96 L.Ed. 872].) It is thus unnecessary to discuss the People's argument that the reception of the confession in evidence did not prejudice defendant because there was also evidence of a subsequent statement which he gave to officials from San Quentin, where he was employed as a prison guard. It may be noted, however, that, although this statement contained some material of an incriminating character, it fell far short of a confession of actual participation in the crimes and that the record does not establish that the prosecution met its burden of showing that the pressure connected with defendant's confession did not also affect the subsequent statement, which was given about 15 minutes after the confession. (*Cf. People* v. *Berve,* 51 Cal.2d 286, 291 [150 P.2d 801] ; *People* v. *Jones,* 24 Cal.2d 601, 609 [150 P.2d 801].)

There are some other claims of error that should be con-

sidered since they involve questions that may recur in the event of another trial.

The jury was erroneously instructed that admissions as distinguished from confessions could be considered whether or not voluntarily made. Any statement by an accused relating to the offense charged is inadmissible against him if made involuntarily. (*People* v. *Atchley*, 53 Cal.2d 161, 171 [346 P.2d 764].)

A .38 police special revolver similar to the gun used by Hecht was admitted in evidence over the objection of defendant. The police found two rounds of ammunition in defendant's automobile that would fit a .38 police special revolver, and evidence as to the type of weapon used by Hecht was relevant with respect to defendant's complicity in the crimes. (*Cf. People* v. *Sampsell*, 104 Cal.App. 431, 440-441 [286 P. 434].) The fact that there was nothing to show that defendant himself had been armed with a gun did not render evidence inadmissible on the type of weapon used in the commission of the crimes. (*Cf. People* v. *Aguirre*, 158 Cal.App.2d 304, 306-307 [322 P.2d 478]; *People* v. *Hurley*, 151 Cal.App. 2d 339, 341 [311 P.2d 49]; *People* v. *Jones*, 114 Cal.App. 91, 92-93 [299 P. 559].)

It was also proper to admit evidence concerning the blackjack, the roll of tape and the tube of grease paint found in defendant's car and to permit the introduction of similar articles for purposes of illustration. There was evidence that defendant purchased a blackjack from a manufacturer of police equipment a few days before the crimes, and a police captain testified that tape, grease paint, and blackjacks were often used in the crimes of kidnaping and robbery. A slip of paper found in Hecht's wallet contained the address of the manufacturer of the blackjack and the name and address of Groo. Although it was not shown that any of the articles found in defendant's car were used in the commission of the crimes, the evidence was of sufficient probative value on the subject of defendant's complicity to warrant its admission.

The judgment is reversed.

Traynor, J., Peters, J., White, J., and Dooling, J., concurred.

SCHAUER, J., Dissenting.—In my opinion the record sustains the initial determination of the trial judge and the subsequent implied determination of the jury that defendant's

confession was voluntary. It does not appear as a matter of law that the police were without justification in taking Mrs. Trout into custody or that they did so in order to elicit a confession from defendant by the use of official threats and promises that her release would depend upon such confession. Rather, Mrs. Trout's original false and inconsistent statements as to the whereabouts of defendant and Hecht at the time of the crimes, and as to the extent of their association, were probable cause for regarding her as an accessory to a kidnaping and robbery for which she knew her husband was under arrest (Pen. Code, § 32; see *People* v. *Garnett* (1900), 129 Cal. 364, 366 [61 P. 1114]) or perhaps even as being herself guilty of complicity in the principal crimes.

Whatever Mrs. Trout's motive for lying to the officers[1] (the evidence on this issue is conflicting) its obviously intended effect was to aid her husband to avoid prosecution. Thus in the early hours of December 24 at her home she was committing the offense of being an accessory in the presence of the officers and they could and properly did arrest her.

The legality as to Mrs. Trout of her subsequent detention is of no concern here. What is of concern, in my view, is that there is evidence that such detention was proper in its inception and that the record does not compel a determination that at some time during its course the police came to the conclusion that Mrs. Trout was no longer (in the language of Lieutenant Murray's testimony) "a suspect in this case" but, despite this conclusion, continued to hold her (in the language of the majority, p. 584, *ante*) "for the purpose of securing a confession from defendant."

I recognize that there is evidence, some of it uncontradicted, that the police made representations, express and implied, that defendant's wife would be released if defendant described his participation in the kidnaping and robbery. But the trial judge and the jury presumably considered these representations of the police in their context. As defendant knew from the interrogation of the officers, they were investigating crimes

---

[1]The majority (p. 584, *ante*) say that "Such inconsistent answers as she gave could well have been the result of the natural inclination of a wife to protect her husband." There is hearsay testimony of an officer that another officer said that he asked Mrs. Trout why she told so many lies and she replied that defendant wanted her to do so. Mrs. Trout testified that Hecht had told her that he participated in the robbery and kidnaping, instructed her to say that he was at the Trout house during the evening of those crimes, and stated that "if I didn't he would blow my brains out"; and that she lied to the police because of that threat, not knowing that Hecht was dead.

committed by a group of conspirators which, according to the victims' statements to the police, included Hecht, a man who accompanied Hecht at the time of the crimes and whom Hecht called Ralph, and a man referred to by Hecht and Ralph in the victims' presence but not seen by them. The officers had ample cause to believe that defendant was one of the conspirators and naturally (and properly, in the performance of their duty) wished to know whether his wife was also a conspirator. Because of the inconsistencies and falsehoods in both defendant's and his wife's statements, the officers had reason to doubt defendant's and his wife's declarations that she was at a church party when the crimes were committed. A description by defendant of his own role in the crimes would aid the officers to determine whether Mrs. Trout had participated therein. (In this connection, because of the majority's emphasis on the lack of evidence that the police made any independent investigation of the truth of Mrs. Trout's statements that she was at church at the time of the crimes, it is noted that she could have aided or encouraged their commission even if she was elsewhere when the criminal plans were carried out.)

In the foregoing circumstances the triers of fact could determine that defendant understood the officers' representations concerning his wife to mean that she would be released if he gave a credible account of his criminal activity which would also show in the light of the investigation already made, or to be made, that she was not involved; the triers of fact were not required as a matter of law to believe that the officers intended, or that defendant thought they proposed, to make Mrs. Trout's release mechanically dependent solely upon defendant's making any sort of purported confession.

Further, I conclude that the record as a whole does not impel the determination that the representations of the police as to the release of Mrs. Trout were inherently coercive so as to vitiate defendant's confession. (See *People* v. *Matlock* (1959), 51 Cal.2d 682, 697 [22] [336 P.2d 505].)

Since I am of the opinion that the record shows no reversible error or miscarriage of justice (Cal. Const., art. VI, § 4½) I would affirm the judgment.

McComb, J., concurred.