Van Allen Beaver

*v.*

State of Tennessee.

414 S.W.2d 841

(*Jackson,* April Term, 1967.)

Opinion filed May 5, 1967.

HUGH STANTON, Public Defender, Memphis, JAMES P. DIAMOND and ROBERT J. HOLT, JR., Jackson, VAN ALLEN BEAVER, per se, for plaintiff in error.

GEORGE F. McCANLESS, Attorney General, and EDGAR P. CALHOUN, Assistant Attorney General, Nashville, for the State; SAM CANTANZARO and HARRY BOSTICK, Assistant District Attorneys General, Memphis, prosecuted the case for the State in the trial court.

MR. CHIEF JUSTICE BURNETT delivered the opinion of the Court.

The parties herein will be referred to as they were in the lower court, that is, Beaver as the defendant and the defendant in error as the State. The defendant was convicted of murder in the first degree and his punishment fixed at death by electrocution.

This murder was done in the perpetration of a robbery. The record shows that the defendant was an indigent

person and the Public Defender of Shelby County was appointed to represent him on March 4, 1965. On July 19 of that year, the defendant indicated to the court that he did not want counsel and signed a waiver to this effect. The Public Defender, though, was directed by the court to sit with the defendant and assist him throughout the trial. The record shows that he did this and conducted much of the examination even though the defendant conducted a great deal of it per se. Mr. Stanton is to our personal knowledge one of the best lawyers in the State and has devoted many years of his life to acting as Public Defender in Shelby County. After this case was appealed, the defendant per se indicated to the Chief Justice of this Court that he wanted additional counsel, and as a result thereof, Mr. Diamond and Mr. Holt were appointed. All three gentlemen have filed excellent briefs on behalf of the defendant herein. The defendant has filed a brief in person in his own behalf. The case has been ably argued on both sides, the briefs are excellent, and, after reading all these, hearing argument, making an independent investigation of the matter and giving it much thought, we are now in a position to decide the case.

A storekeeper, who had a hardware store in Memphis, was found unconscious behind the counter of his store about noon on October 19, 1964. This man died late the following day without regaining consciousness. He was sixty-two years old, and weighed only about a hundred pounds. An autopsy revealed that death was caused by multiple tears of the brain and fractures of the skull. A medical witness said that there were five wounds on his head caused by a blunt instrument. A layman who viewed the body of the man said that the top of his head was caved in.

When this man was found by two women, who happened in about that time, there were signs in the store of a struggle and blood stains on the floor which indicated that the victim had either moved or been dragged a few feet. The cash register contained only about fifty pennies after this man was found although the tape showed sales totaling something in excess of $39.00. An assortment of merchandise taken from the stock was found scattered on the counter and floor with sales slips. The items listed on the sales slips were matched to this merchandise but one of two hammers listed was not found immediately. The missing hammer was found in the store later by a member of the family of the deceased man between the bottom shelf and the floor. This hammer had human blood stains on it. After the hammer was found it was turned over to the police and a member of the family put a similar hammer back in the hiding place of the bloody one as a decoy upon the theory that the killer might attempt to retrieve it.

After about a month, no one had been accused of this crime (the defendant was not a suspect and so far as the record shows there was no suspect in the case). On November 24, 1964, or a month after the crime was committed, a Lieutenant of the Memphis Police Department talked with the defendant in the colored detention quarters of the Shelby County Jail about a forgery of a check. The defendant was heretofore convicted of robbery on October 30, 1964, and the opinion in this case will be found styled in *Beaver v. State,* 217 Tenn. 447, 398 S.W. 2d 261. The defendant was in jail for check forgery and other things apparently. During the conversation of this Police Lieutenant with the defendant on November 24, the defendant asked about the murder of the "ole man

down on McLemore''. This was where the murdered victim's store was located and where the victim was found. The Police Lieutenant did not know anything about the case. The defendant continued to talk about the murder case and pulled from his pocket a newspaper clipping which reported a reward offer. Then, the defendant told this Police Lieutenant that he knew the murderer and that the murderer had laughed at the police's efforts to get fingerprints. Finally, the defendant insisted on talking to a local business man who had helped raise the reward for the apprehension of the one who had killed "the ole man on McLemore Street." The defendant wanted to talk to this business man so that he could be sure to get the reward if he furnished the information.

The Police Lieutenant reported this conversation and arranged a meeting between the business man who had offered the reward and the defendant on the following morning in the interrogation room of the local county jail. At this meeting another Police Lieutenant was there, who was in charge of the Homicide Division, and sat in with the other Police Lieutenant and the citizen to hear this conversation. The defendant did most of the talking, asking about the reward for assurance that the money was in a bank. In this conversation the defendant emphasized that he wanted the money for his girlfriend. Finally, the defendant made the statement that he was not trying to incriminate himself but was using himself as an example and asked: "What if I did it?" Lieutenant Wilkerson of the Police Department replied that he couldn't answer that but that the defendant would have to talk to a lawyer and he would call a lawyer for him if he wanted one. The defendant was either silent or replied that he didn't want a lawyer. This whole

conference between the citizen, the two police representatives and the defendant lasted about fifteen minutes.

The defendant next told the first policeman to whom he had talked that he wanted to talk to him outside the room. This policeman and the defendant went outside into a Chapel, and it was then that the defendant voluntarily stated to Lieutenant Beach that he, the defendant, had killed Mr. Woods. Lieutenant Beach replied to the effect that he was busy and didn't want to talk to the defendant any more unless defendant told the truth. The defendant replied that he was telling the truth and then told Lieutenant Beach in detail how he killed Mr. Woods and robbed him of his billfold and the cash register funds. Lieutenant Beach took notes.

Lieutenant Beach and the defendant then went back into the room where the citizen and the other policeman were waiting. The officers asked Mr. Ford to leave and the defendant repeated his confession to the other policeman. Later the defendant took the officers on a tour of the murder scene, pointing out where he had hidden the hammer, thrown away the billfold and the place where he caught a ride with two tree trimmers away from the place where the murder had occurred.

In reading the details of how this was done by the defendant it seems that he first caught a bus but he saw two women come along who saw what had happened inside and they looked nervous so he got frightened and left the bus and caught a ride with these tree trimmers. These two policemen then took the defendant's confession and reduced it to writing. This was done by an Inspector at the Police Station who advised the defendant that he did not have to make a statement and that it could be used against him. As far as this record shows the defendant

did not at any time request an attorney. It will be remembered when he first talked with Lieutenant Beach the Lieutenant told him he ought to get a lawyer. He was not accused of the crime nor questioned as to his involvement in it prior to his, we say and think, voluntary confession.

In the confession, just referred to, the defendant told in detail the story of the crime and the evidence shows, which he copies in full in his brief filed herein, that for some reason or other he felt like he was justified and must do this because his landlady was going to evict him for non-payment of his rent. He said when this happened he wandered around and selected Mr. Woods' place to rob because the old man was alone; that he selected a variety of household goods which had been scattered around the store and were listed on the sales slips while he awaited an opportunity to hit Mr. Woods on the head three times with the hammer; he says he took the billfold and cash and left the store and caught a bus when he saw these two excited women who had discovered the crime as the bus passed by; that he then caught a ride with these tree trimmers; then he told how he disposed of the billfold and how he paid his rent with the proceeds of the robbery. He detailed the street corner where he threw the billfold.

The confession was corroborated by the testimony of the women who found Mr. Woods and were seeking help when defendant rode by on the bus, by the testimony of one of the tree trimmers who provided transportation, by the testimony of his landlady, by the testimony as to the discovery of the bloodstained hammer, and by the physical evidence at the scene of the crime as heretofore set out.

The defendant claimed that his confession was coerced and that he was beaten by the police officers at the time the confession was made in the city jail. The defendant's girlfriend testified that she was present when the defendant confessed in the city jail; that he wasn't beaten in her presence; that he had no bruises or marks on him; and it did not look as if he had been beaten. The Police Lieutenants testified herein and deny any coercion or beating or anything of the kind.

We agree with the statement of the State in its brief that the issues are in effect (a) whether or not the defendant's confession was admissible in view of all the facts and circumstances attendant thereto; (b) whether or not the defendant was prevented from taking the stand to testify as to the voluntariness of his confession; (c) whether or not the trial court erred in instructing the jury relative to the law on a confession induced by hope of reward to be paid the defendant's common law wife. Of course, in the absence of the confession there is nothing in the world herein to tie this defendant to this crime. This being true, the first question to determine is whether or not this confession was admissible.

"The admissibility of confessions so largely depends upon the special circumstances of each case that it is probably impossible to formulate any rule which will embrace all cases." Underhill's Criminal Evidence, 5th Ed., Herrick, pages 973 and 974, sec. 386.

The facts and circumstances of this confession have heretofore been summarized sufficiently. It seems to us that this record without peradventure of a doubt presents a situation when the defendant was not a suspect and was not interrogated by the police in reference to this crime, but he nevertheless volunteered to the police his confes-

sion of the crime with the hope that an outstanding reward would be paid to his common law wife. Such a hope of reward was not induced in his mind by the police or any other law officials. This hope was a product of his own mind; a scheme purely and simply concocted by him. In *Beaver v. State,* supra, we clearly outlined what the traditional test of admissibility of a confession is when this Court speaking through Mr. Justice Chattin said:

"It has long been the rule in this State the admissibility of a confession in a criminal case is a preliminary question to be determined by the trial judge. He must first determine there is credible evidence a confession has been made and whether it was made freely and voluntarily."

And further:

"If the one charged with the crime freely and voluntarily confesses to the charge without inducement, coercion or fear, he has not been fundamentally prejudiced, and by voluntarily making the statement he has waived his right to Counsel and to remain silent, although he has not been advised of these rights by the officers."

This case, *Beaver v. State,* supra, and others, which may be found by Shepardizing the matter, discuss the impact of this feature of the law by the holding of *Escobedo v. State of Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. We in a number of our decisions determined that *Escobedo* did not change the basic test of voluntariness, and that whether or not the accused was advised of his right is a factor to consider in determining the issue of voluntariness. We think that the view that we have adopted in various decisions of *Escobedo* is con-

sistent with the effect given the holding by the United States Supreme Court in *Johnson v. State of New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882, where, in part, it was said:

"Apart from its broad implications, the precise holding of *Escobedo* was that statements elicited by the police during an interrogation may not be used against the accused in a criminal trial.

" ' '* * * [where] the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent * * *.' 378 U.S., at 490-491, 84 S.Ct., at 1765."

██ This *Johnson* case likewise holds that the *Escobedo* doctrine would be available only to defendants whose trials began after June 22, 1964. It was also stated therein that warnings to a suspect being interrogated as set forth in *Miranda v. State of Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, would be available only to persons whose trials began after June 13, 1966. The *Miranda* case likewise set forth certain warnings, etc., which should be given to the person detained by interrogating police officers, but the doctrine in *Miranda* is not applicable in this case, which was tried in 1965. It thus seems clear to us that the confession herein which was voluntarily given by the defendant to the police based upon some hope concocted in his mind is not barred by *Escobedo* and this Court's own cases, even

though such person was not warned of his rights. A confession made under such circumstances would not be barred by the *Miranda* doctrine either, because, as said in *Miranda:*

"In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Miranda v. State of Arizona,* 86 S.Ct. 1602, 1630.

It is argued and forcibly so in all briefs on behalf of the defendant, as was argued orally before us, that this confession was induced by hope that the reward would be paid the defendant's common law wife. The facts, as we see them from this record, do not sustain this contention. Whatever hope the defendant had it was not induced by the police officers. As we have said before this hope was a product of the defendant's own mind and scheme. The State aptly quotes from Wharton's Criminal Evidence, Vol. 2, 12th Ed., Anderson, sec. 378, page 108, a portion of this Section, which is as follows:

"When the hope is merely the wishful thinking or belief of the accused, it is insufficient to render the confession involuntary, because the inducement must come from another person."

Preceding portions of the paragraph from which this quotation is derived set forth in very clear and understandable language when inducements or fear or things of that kind will make a confession involuntary and thus inadmissible, and as authority for these statements some of our cases of years past are cited. The State likewise quotes from the authors of *People of State of California v. Trout,* 54 Cal.2d 576, 6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418, 1438, a paragraph on this question which is very reasonable and understandable to the effect:

"It is well recognized that a confession is 'involuntary' in the constitutional sense, so as to be inadmissible in evidence, only where it was produced by wrongful pressure applied by officials or others acting for, or whose actions were adopted by, the prosecuting authority. Accordingly, the cases have held that a confession or admission is not inadmissible in evidence merely because accused, in making it, was motivated by his desire to protect a relative in police custody or threatened with arrest, or where the proposition as to the protection of the relative was not suggested by the police but originated with accused."

█ In our reading of various and sundry cases from our State and others in reference to the admissibility or inadmissibility of a confession, that is, whether or not it was voluntary, we found a statement made by a California court in *People v. Hubbell,* 54 Cal.App.2d 49, 128 P.2d 579, which to our mind is particularly applicable under the factual situation presented in this case we

are now considering, and is the correct rule to follow in determining whether or not this confession was admissible. That court, at page 594 of 128 P.2d, says this:

"It must be apparent that a confession dictated by the hopes and motives of the accused and inspired solely by his own mental processes and emotions is voluntary in a legal sense. It is not the pressure of the circumstances surrounding the accused person, but pressure exerted by others tending to influence his actions, that is to be weighed in determining whether his confession of guilt has been made voluntarily or under the compulsion of external influences."

We adopt such a statement as applicable to the factual situation in the present case and as a rule to be followed in such instances as in this case.

From what has been said herein it is obvious that this defendant thought he knew more about conducting a criminal trial than an experienced lawyer would know. This defendant is not a youth without experience or know how. He was not under the influence of drink or a drug; he was not mentally incapacitated; he was very experienced in criminal trials, etc. All this is the best evidence of the police's statement that he refused a lawyer in the first instance (he refused one even after indictment and at trial but the court appointed one anyway).

The overwhelming weight of the evidence clearly negates the theory of any coercion or inducement on the part of the police officers.

The next question raised on the supplemental brief by Mr. Holt is whether or not there was error committed when it is said that the trial court prohibited the defendant from taking the stand to testify in the absence

of the jury as to the admissibility of his confession. The factual situation surrounding this is that the question first arose when the first witness for the State had completed his testimony in the absence of the jury. At that point the defense counsel said he would like to put defendant on the stand. The court interrupted to ask the State if it had any more witnesses, and counsel for the State replied it had one or possibly two more witnesses. The court then suggested that the State put on all its proof, which was done. Two additional witnesses testified in the absence of the jury as to the admissibility of the confession. A recess was taken, and after the recess the following colloquy between the court and counsel took place:

"THE COURT: All right, Mr. Stanton, you don't want to put on any (interruption)

"MR. STANTON: No. I, I, we'll rest.

"THE COURT: All right, I will hear anything you have to say."

It seems to us from the foregoing conversation counsel for the defendant, who was acting with the defendant, decided that he did not wish to put the defendant on the stand at that time. The defendant who spoke for himself many many times throughout the trial was silent on this issue so far as this record shows. Thus we think that the record does not support the contention that the trial judge refused to allow the defendant to testify as to the admissibility of the confession while the jury was out. This would not have been necessary and would not affect the matter one way or the other in view of what the defendant says and his actions herein.

■ The next issue concerns whether or not it was error for the trial judge to instruct the jury that a confession made with hope of obtaining a collateral benefit is not involuntary when the collateral benefit sought is not related to immunity from the consequences of the crime charged. This instruction in effect permitted the jury to again pass upon the issue of voluntariness of the confession. We in *Shafer v. State,* 214 Tenn. 416, 381 S.W.2d 254, discuss this procedure of the court and the jury both passing upon the legality of searches and confessions and determine that it certainly wasn't error and no harm was done the defendant. As a matter of fact he was getting the best of the situation. There are a number of states over the country we found in our investigation that do not leave it entirely to the judge to hear these things in the absence of the jury and do not make it entirely a question of law for him but do submit the matter to the jury under proper instructions. As a matter of fact the instruction thus given is nothing more than submitting again to the jury the defendant's theory of the case.

After very carefully reviewing this record and thinking about the matter considerably, we cannot possibly see where there is any error herein or that the defendant's rights have not been protected throughout and we feel that he has had an extremely fair trial.

It therefore results that the judgment below must be affirmed, and the execution provided for herein will take place on October 20, 1967.