[Crim. No. 2937.   Fourth Dist., Div. One.   Apr. 18, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN ALBERT SISTO, Defendant and Appellant.

·Donald J. Helmer, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Mark L. Christiansen, Deputy Attorney General, for Plaintiff and Respondent.

WHELAN, J.—Defendant, who was convicted in a nonjury trial of second degree burglary, appeals from a judgment committing him to California Youth Authority.

Shortly after 1 a.m. on March 23, 1967, the A to Z Dismantling Corporation building in San Diego was forcibly entered and some automobile parts kept therein were stolen. Some of the missing parts were sold to San Diego Metals and others to National City Scrap Disposal on March 23 by one Frank Knapp, who was driven to those places by defendant in defendant's car; also in the car was one Andrews.

A description of the car and its license number had been furnished to the police by someone at one of the two places of business where the sales were made.

On March 24 at about 8:30 a.m., defendant, while driving the same car, was stopped by police for a traffic violation; when asked for his identification, he presented a document carrying the name and address of a person of another name. With him were his wife, his two children, of whom the elder was four years old, and his wife's brother (Rico), aged 16.

The police had the information that the driver of the car was connected with a person who had made a sale of property stolen in the burglary; the information further was that besides the person making the sale, the other occupants of the car at that time had been two males of Mexican appearance, one of them a boy. They had instructions to bring all occupants of the car into the station.

The police placed defendant under arrest and took him, and the other occupants of the car, to the police station.

. At the police station, a police officer, Guerin, interviewed defendant's wife. She was willing to answer questions and was told that her husband's car was a suspect vehicle in

connection with the burglary. After an interview that lasted about 15 minutes, Guerin took the wife to the hallway and told her she might sit there. She did not feel that she was a suspect, she testified. Her children remained with her at all times while she was at the station.

So far Guerin had no information connecting the wife with the crime, but had not decided that he would not pursue the matter further; after she had left the station he made further inquiry as to whether she might be implicated.

Rico also was questioned by a juvenile officer at the Juvenile Bureau.

After leaving the wife, Guerin interviewed defendant, to whom the officer first stated the rights to which he was entitled under the Fifth and Sixth Amendments to the federal Constitution, and who was then asked if he understood those rights, and who said he did. He was told about the burglary, where and when it had occurred and what was stolen, and that some of the stolen articles had been sold by a man giving the name of Frank Knapp who left the place of sale in a car that answered the description of defendant's car.

After all of that, defendant said his primary concern was what would happen to his wife and children. A part of the examination of Guerin is as follows:

". . . He was then told the basic circumstances surrounding the burglary, what had occurred, when it had occurred, and then was asked whether he would consent to discuss this with the officer knowing what he was going to be questioned about, and he stated that he would. At that point he then related to me that his primary concern at the moment was not over the questioning but what would happen to his wife, or what was going to happen to his wife and children. At this point, why, he was told that if his wife were not involved then she would not be prosecuted; if she were involved, then a complaint would be drawn up and she would be prosecuted for burglary.

"He then asked what would happen to his children. He was told if his wife were booked in the city jail that his children would be released to either a reliable relative or, if one could not be found, then they would be placed in the Hillcrest Receiving Home.

"And this is basically the conversation that transpired relative to what would happen to his wife and children.

". . . . . . . . . . . . . . . .

"Q. Prior to further talking to him did you in any way tell him that if he did not talk to you that you would file a complaint against his wife?

"A. No, sir.

"Q. Did you tell him that if he didn't talk to you that some type of harm would come to his children?

"A. No, sir.

"Q. Or if he did not talk to you that they would be placed in Hillcrest?

"A. No, sir.

"Q. Did you tell him that if he would not talk to you his brother-in-law, or anyone else, would be charged with a crime, or make any other threats regarding his brother-in-law or any other relatives?

"A. No, sir."

Defendant then stated that he and Knapp had found the property sold by Knapp in an alley; shortly he corrected his story to say that he and Knapp and Andrews, known to defendant only as Elliott, had entered the burglarized building and stolen radiators and batteries which were sold later that day; Knapp and Andrews had come to his house and invited him to join them because he had a car; his wife came home from work at 1 a.m. Defendant had then gone out and joined Knapp and Andrews, and drove them to the scene of the burglary, where Knapp and Andrews had been earlier.

Defendant asked to say "good-bye" to his wife and children. Guerin went to the hallway where the wife and children were, and where Rico also was at that time. Guerin told the wife her husband had admitted participation in a burglary.

According to Mrs. Sisto, when Guerin came to tell her that her husband had admitted the burglary, she had been waiting 35 or 45 minutes since her own interview was concluded. When the wife, Rico and the children came to the room where defendant was, she exclaimed, "What did you do it for," to which defendant answered, "I needed the money." Defendant had not had any earlier conversation with his wife at the station.

The wife, her children and brother left the police station, remaining in the corridor, however, until after defendant had been handcuffed and was taken to the captain's office for booking.

Knapp testified as to the sale of certain property on March 23 at places where he was driven by defendant, to whom Knapp had given $5 of the proceeds.

Andrews testified that he and Knapp were driven by defendant to an alley behind the burglarized premises; that he and Knapp entered the building after going over a fence, while defendant remained behind; that the stolen goods were placed in defendant's car and carried away in it.

No evidence was presented by defendant except that of his wife and Rico, who testified on *voir dire* for the purpose of attacking the voluntariness of defendant's confession. Rico testified that the defendant:

". . . asked what was going to happen to his wife and children and one of the police officers said, 'Well, we are going to ask her some questions and if she lies we are going to book her and take the kids to the Hillcrest Receiving Home.'

". . .

". . . they had me and John in the car for about fifteen minutes after we arrived, and then they told us to get out; you know, they opened the door and got us out. At that time, that's when John asked about the kids, when we were out at the car. And then we started walking."

Rico did not attempt to identify the police officer who is supposed to have made that statement. Clearly it was not Guerin, whose conversation with defendant took place in an interrogation room within the building, which was the only time and place at which defendant asked Guerin what would happen to his wife and children.

### Contentions on Appeal

The sole contention on appeal is that defendant's confession and admissions were not voluntary; and that without such confession and admissions the evidence is insufficient to sustain the conviction.

As to the voluntariness of that confession, there is no evidence whatever, unless it be the matter testified to by Rico, to indicate the use of threat, intimidation, deceit or coercion of any type. Nothing in the testimony of defendant's wife suggests that she was threatened in order to open defendant's lips; nor in Guerin's testimony is there any intimation that defendant's wife or brother were used as pawns to obtain defendant's statement.

Defendant cites a number of cases to support his contention, in all of which there were reversals because of the introduction of a confession not voluntarily made.

In *People* v. *Berve*, 51 Cal.2d 286 [332 P.2d 97], the defendant was kidnapped, threatened with a weapon, and subjected to brutal physical attack.

In *People* v. *Trout,* 54 Cal.2d 576 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418], both defendant and his wife were detained overnight; he was questioned over a period of five and one-half hours commencing in the morning, during a part of which time his wife was intermittently present, and at some times he and she were left alone. They had been brought to the station shortly after midnight, their three children being left at home. A statement was obtained from the wife at about 3 a.m. and from the husband at 3 :30 p.m.

In *People* v. *Manriquez,* 231 Cal.App.2d 725 [42 Cal.Rptr. 157], an express promise was made to the defendant that if he admitted ownership of certain marijuana cigarettes his wife would not be charged.

In *People* v. *Rand,* 202 Cal.App.2d 668 [21 Cal.Rptr. 89], the defendant was presented with these alternatives: admit ownership of the contraband marijuana or your wife will be taken to jail as well as yourself.

In *People* v. *Leavitt,* 100 Cal.App. 93 [279 P. 1056], witnesses testified that a police officer told defendant that it would "be much better for him" to make a confession, which the officer under cross-examination did not deny.

Guerin did not tell defendant that his wife was a suspect.

There was, however, reason to question her; even though the persons in defendant's car when Knapp made the sale were all males, the sex and identity of the person or persons actually participating in the burglary were not yet known. Defendant's wife also might have had knowledge of her husband's whereabouts during the night of the burglary.

There was good reason for the police to take Rico to the station for questioning. At the time of trial he was of the same age, 16, as Andrews.

If we assume the truth of what Rico testified as to the statement made by a policeman to defendant outside the police station, we should acknowledge that thereafter defendant was given a straightforward statement by Guerin as to what the true situation with regard to his wife and children was. Defendant requested the information, the refusal by Guerin to give which could well have a more ominous tone than the giving of correct information.

It may be assumed that the defendant knew whether his wife was involved; the answer to his question cannot reasonably have been considered a threat of a trumped-up prosecution.

Although Mrs. Sisto was not under physical restraint while she was sitting in the hallway with her children after her

questioning by Guerin, it is clear that had she been seen attempting to walk out she would have been detained.

It is equally clear, however, from the fact that she remained in the hallway after her interview with her husband, that she would, under any circumstances, have remained near him as long as she was able to, and until he was either released or locked up.

No evidence suggests that defendant, in making his statement, was motivated by fear that his wife would be prosecuted if he remained silent. Even as to the matter testified to by Rico, the threat as to the wife depended not upon what defendant might say, but upon what his wife might say. If that statement be considered to have had an effect upon defendant when it was made, the trial court reasonably could have concluded that its effect was wiped out by the statement later made by Guerin.

Where a suspect, being interviewed by police under conditions that would permit the use of a voluntary statement made by him, asks a question to which he might reasonably expect an answer, an honest and straightforward answer to the question will not support a claim that a statement thereafter obtained by the police was involuntary in the absence of all other elements of involuntariness, if the answer does not itself contain any such element.

The entire picture is not one set in a framework of deception, trickery, intimidation or coercion.

Judgment affirmed.

Brown (Gerald), P. J., and Coughlin, J., concurred.