**STATE of Iowa, Appellee,**

v.

**Kervin M. HILPIPRE, Appellant.**

**No. 2–58426.**

Supreme Court of Iowa.

May 19, 1976.

William A. Long, Eagle Grove, for appellant.

Richard C. Turner, Atty. Gen., William D. Scherle, Asst. Atty. Gen., and Larry E. Ivers, County Atty., for appellee.

Heard by MOORE, C. J., and MASON, RAWLINGS, LeGRAND and REES, JJ.

RAWLINGS, Justice.

Defendant, Kervin M. Hilpipre, appeals from judgment on jury verdict finding him guilty of terrorizing dwelling inhabitants in violation of Section 714.2, The Code 1973. We reverse.

The factual situation, hereinafter set forth, is gleaned entirely from the record made upon defendant's pretrial motion to suppress any self-incriminating statements he had made or given, upon the premise they were obtained by means which violated privileges accorded him under specified constitutional provisions, both federal and state.

The above charge stemmed from an alleged firing by defendant of three rifle shots into the Eagle Grove mobile home of his employment supervisor on January 31, 1975. Defendant's former wife, with whom he was living at time of the incident, purportedly drove the vehicle from which the weapon was discharged.

Wright County Deputy Sheriff Michael A. Wilson and William A. Adams, engaged by Northwestern Transportation Company, defendant's employer, conducted the instantly involved investigation. As a result of an initial inquiry, they went to Hilpipre's residence in Webster City about 4:00 p. m., February 1, for the purpose of questioning him. He was there orally given the so-called Miranda warnings. The investigators then inquired as to whether Hilpipre had any weapons in his home and he produced two rifles.

Defendant was thereupon taken to the Webster City Police Station where he was given a written Miranda warning and signed a "Waiver of Rights" form. Shortly thereafter, Hilpipre stated this was apparently a serious matter and he had better talk to an attorney. In the ensuing hour and a half defendant unsuccessfully attempted, at least eight times, to contact a lawyer by phone. Nevertheless the interrogation continued.

At approximately 7:30 p. m., the investigators returned with defendant to his home where he is said to have orally admitted commission of the above stated offense. Upon return to the station Hilpipre signed a written confession.

Prior to trial defendant moved to suppress any admission or confession made or given by him. Upon hearing before Judge Wild this motion was overruled.

Also, before commencement of trial Hilpipre ineffectively moved for a review of the proir suppression motion by Judge Draheim, then and thereafter presiding.

Later, in course of trial, defendant interposed a standing objection to introduction in evidence of any oral or written inculpato-

ry statements he may have made because they were not voluntarily given.

Other relevant facts will be later set forth as they pertain to issues presented for review.

In support of a reversal defendant contends trial court erroneously overruled his suppression motion and objection to introduction in evidence of any inculpatory statements, oral or written, because he (1) did not effectively waive right to counsel and (2) was induced to confess by promised leniency and the assurance that if he did so his former wife would not be prosecuted.

As a preface to consideration of the questions thus presented, certain applicable principles are noted.

■ I. Unquestionably, Hilpipre was subjected to custodial interrogation. See *State v. Franks*, 239 N.W.2d 588, 591 (Iowa 1976), and citations.

■ II. It is well settled an individual may legally waive his or her constitutional rights. But the State must prove by a preponderance of evidence such was knowingly, voluntarily and intelligently done. See *State v. Iowa Dist. Court In & For Linn Cty.*, 236 N.W.2d 54, 56 (Iowa 1975), and citations; *State v. Allen*, 224 N.W.2d 237, 238 (Iowa 1974).

■ And even though there be an effective waiver of rights by an accused the State must still establish by like proof an accused's subsequent incriminatory statements were voluntarily made or given, i. e., the product of a "rational and free will", as a prerequisite to their admission as evidence in chief against him or her. See *Schneckloth v. Bustamonte*, 412 U.S. 218, 223–226, 93 S.Ct. 2041, 2045–2047, 36 L.Ed.2d 854 (1973); *State v. Franks, supra.*

To the same effect is this statement in *State v. Ware*, 205 N.W.2d 700, 703 (Iowa 1973), quoting from *Brady v. United States*, 397 U.S. 742, 753, 90 S.Ct. 1463, 1471–1472, 25 L.Ed.2d 747 (1970):

"'* * *. To be admissible, a confession must be " 'free and voluntary: that is, must not be extracted by any sort of

threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" * * *.'"

■ III. It is also understood that where, as here, constitutional safeguards are invoked, we are obliged to make our own evaluation of the circumstances in totality upon which rulings were made below. This means evidence relative to a given issue is reviewed de novo. See *Rinehart v. State*, 234 N.W.2d 649, 658 (Iowa 1975), and citations.

■ IV. Furthermore, in weighing voluntariness of any inculpatory statements made by an accused, it is not for us to consider or determine whether they are true or false. See *Lego v. Twomey*, 404 U.S. 477, 485, 92 S.Ct. 619, 624–625, 30 L.Ed.2d 618 (1972).

■ V. Finally, an adverse ruling on a pretrial suppression motion will suffice to preserve error for appellate review even though there is no attendant trial objection to the controverted material when offered in evidence. See *State v. Untiedt*, 224 N.W.2d 1, 3 (Iowa 1974). See also *State v. Feddersen*, 230 N.W.2d 510, 512 (Iowa 1975); *State v. Liesche*, 228 N.W.2d 44, 46 (Iowa 1975); *State v. Vest*, 225 N.W.2d 151, 152 (Iowa 1975).

VI. Mindful of the foregoing, we turn to specifics of the case.

First considered is defendant's claim to the effect investigators Wilson and Adams wrongfully persisted in questioning him after he had expressed a desire to consult an attorney.

On that subject the record discloses this dialogue between the prosecutor and Michael A. Wilson while the latter was testifying in chief as a State's witness:

"Q. (By Mr. Ivers) When you were at the Webster City Police Station, did the defendant ask for an attorney or state that he desired to speak with an attorney or have an attorney present? A. Yes, sir, he did.

"Q. And did he attempt to contact an attorney? A. Yes, sir, he did.

"Q. Did you assist in that attempt? A. I handed him a telephone book and a phone and that's it.

"Q. Did he call more than one lawyer? A. He tried several, and received no answer at any of them.

"Q. Did he continue his pursuit or at some point did he stop and indicate that he was willing to go ahead with the interrogation without the presence of an attorney? A. He had made the statement and the exact words I cannot tell you, it was something to the effect to hell with it, all they do is cost money anyway.

"Q. Are those the only words he utilized? A. He made reference that he didn't feel they were going to do him anything except take money from him as far as doing him any justice."

Later, at close of defense counsel's cross-examination of William A. Adams this exchange occurred between the presiding judge and said witness:

"THE COURT: Now, what time was it that you went to the police station? A. It must have been getting real close to 4 or 4:30, right in that neighborhood.

"THE COURT: And did the defendant immediately start trying to contact the lawyer after he was given his Miranda warnings? A. Yes, sir.

"THE COURT: Now, various times you referred to interrogation of the defendant, you referring to interrogation while he was at the police station? A. Yes, sir.

"THE COURT: You continued to ask him questions after he requested a lawyer? A. Yes, sir."

In the same vein, when Adams was asked by the prosecutor whether defendant had requested an attorney his answer was "Yes, sir, and we gave him a telephone book and he placed several telephone calls." Also, as to waiver of counsel, this same witness, in response to another inquiry by the presiding judge, stated: "* * * I *guess* he [defendant] decided he didn't want one * *." (emphasis supplied).

The question now posed is whether any inculpatory statements made by Hilpipre

after he had manifested a desire to consult an attorney should have been suppressed.

At the outset, this statement in *Miranda v. State of Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966), comes into play: "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present at that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning."

The same principle was thus applied in *State v. Moon*, 183 N.W.2d 644, 649 (Iowa 1971): "[W]henever an in-custody accused *in any manner or at any time* invokes his right to counsel, any questions thereafter asked * * * constitute a part of the *Miranda* proscribed interrogation process." (emphasis supplied).

■ As already noted, an accused may waive right to counsel during any custodial interrogation process. In that event, however, the State must prove by a preponderance of the evidence such waiver was knowingly, voluntarily and intelligently effected. In this respect the record discloses nothing more than confusion, uncertainty and ambivalence on defendant's part as to whether he should continue his previously futile efforts to secure legal advice. Such patently falls far short of a knowing, voluntary and intelligent waiver of right to counsel.

■ VII. We need not, however, rest a reversal upon the foregoing alone. More specifically, it is to us evident any self-incriminating statements given by defendant were elicited by proscribed "promissory leniency".

This is first demonstrated by these questions put to the witness Wilson and his responses thereto:

"Q. Did you ever tell him [defendant] that it might be better if he told you because then you could file lesser charges on him and you wouldn't have so much to hassle with? A. I read two or three different charges that could be pressed against him and I told him at the time

that I had intended, which I did do, charge him with assault with intent but there were worse charges that could be brought against him if I so desired.

"*   *   *

"Q. Did you explain to him the difference between a misdemeanor and an indictable misdemeanor or a felony? A. I told him the difference between a misdemeanor and a felony.

"Q. You felt that you had the discretion as to what charges to file in regards to this, is that correct? A. Yes, sir, I did."

Later, during examination of investigator Adams this colloquy occurred:

"Q. Yeah, okay. Were you ever present when Mr. Wilson talked to the defendant in regards to the charges that could be or would be filed against the defendant. A. Yes, sir, he read several charges to him.

"Q. Do you know for a fact or by hearing Mr. Wilson indicate that some were felonies and some of them were not felonies? A. Yes, sir, I think one or two of them were felony charges.

"Q. What was the—strike that. While you were present and did Mr. Wilson ever indicate to the defendant that if he cooperated he would file the one that he eventually did file against him? A. Yes, he indicated that there would only be one charge filed against him should we have cooperation from him.

"Q. And that would have been the misdemeanor then, is that correct? A. The—

"Q. Well, the indictable misdemeanor as you understood it? A. Yes, sir."

Additionally, Hilpipre was assured that if he cooperated in the giving of a statement the investigators "would assist him in possibly not going to jail."

In *State v. Mullin*, 249 Iowa 10, 85 N.W.2d 598 (1957), an investigating officer told the accused "more mercy" would be accorded him if he told the truth about what happened whether he committed the offense or not. This court, in condemning such conduct said:

"[I]t seems clear these statements were such as might well raise in the mind of the accused the hope that if he made the so-called confession he would receive better treatment, less severe punishment, and more mercy than if he denied his guilt and was tried and found guilty of the offense by the jury. Statements so obtained consistently have been termed involuntary, not only by the courts of his jurisdiction, but throughout the country." Id. at 13, 85 N.W.2d at 600.

"[T]he statement by the officer 'flattered the hope' of the defendant and was certainly in the nature of an inducement to speak or admit his guilt.

"*   *   *

"[A] confession wrung from the mind by the flattery of hope, or by the torture of fear, comes in such questionable shape as to merit no consideration.

"*   *   *

"[W]hen the officer or officers   *   *   * explain just how it will be better or wiser for the accused to speak, these statements may suddenly become more than an admonishment and assume the character of an assurance or promise of special treatment which may well destroy the voluntary nature of the confession in the eyes of the law." Id. at 15–16, 85 N.W.2d at 601.

Supportive of *Mullin, supra,* is *State v. Ware*, 205 N.W.2d at 701, where we noted:

"Cross-examination of [one of the investigating officers] disclosed, however, before [the defendant] made the aforesaid incriminating statement [another officer] had said to defendant 'it would go easier if he wanted to tell us anything.'"

And Id. at 703 is this statement:

"[W]e are satisfied the aforesaid 'not so subtle' promissory leniency expressed by [the investigating officers] induced the then frightened defendant to incriminate himself. [Citation]."

It is to us evident any incriminatory statements elicited from defendant, oral or

written, were the product of vitiating "promissory leniency", therefore not voluntarily made or executed.

VIII. Interrelated with "promissory leniency" is another facet of the case which focuses upon a psychological confession-connected inducement wrongfully employed by the investigators.

The record clearly discloses the named investigators promised Hilpipre, before any self-incriminating statements had been voiced or given by him, that if he cooperated his former wife "would be left alone". Moreover, such assurance was admittedly given in order to gain defendant's "cooperation".

Closely on point is this quote from *Hall v. State*, 255 Ind. 606, 266 N.E.2d 16, 19 (1971):

"Appellant claims he was intimidated into signing the confession in that police officers stated that his wife was a prime suspect in the burglaries along with the appellant, and there was a clear implication if he did not confess, she would be charged, which would necessitate the place [sic] of appellant's small children in the custody of others. We do not doubt that the police officers were fully justified in believing that appellant's wife was in fact a prime suspect in the burglaries nor is there any doubt had she been charged appellant's children would by necessity have been cared for by persons other than appellant's wife. There is nothing in this record to indicate the confession made by the appellant was untrue. However, the truth of the situation is not the governing criteria in making the determination as to whether or not the appellant's confession was given freely and voluntarily after being fully apprized of all the facts and circumstances.

"* * *

"Even if we assume appellant's statement is in fact true and even though appellant's wife was a suspect and might well have been charged and convicted, when the threat to so charge and attempt to convict is made by police officers to 'encourage' the appellant to make a full confession, we cannot say as a matter of law that that confession is given freely and voluntarily by the appellant."

And, in *United States v. Hill*, 340 F.Supp. 344, 350 (E.D.Pa.1972), a confession was held to have been involuntarily derived. In support thereof the court aptly observed:

"[T]o manipulate the defendant's decision by prolonged emphasis on its effect on the fate of his wife is a dangerous course at best, in that there is a good possibility that some defendants, even innocent ones, might under the circumstances make false incriminating statements to procure the release of a loved one."

See also *United States v. Guaydacan*, 470 F.2d 1173 (9th Cir. 1972); *State v. Johnson*, 241 Iowa 135, 138, 39 N.W.2d 123 (1949); *People v. Trout*, 54 Cal.2d 576, 6 Cal.Rptr. 759, 764, 354 P.2d 231, 236 (1960); Annot., 80 A.L.R.2d 1428, 1431; cf. *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).

The foregoing manifests nothing less than another confession tainting inducement.

IX. Upon the basis of our in totality review of the involved facts and circumstances we now conclude defendant's suppression motion and his concomitant objection to introduction in evidence of the disputed inculpatory statements should have been sustained. Trial court erred to defendant's prejudice in holding otherwise.

REVERSED AND REMANDED FOR A NEW TRIAL.

MOORE, C. J., and MASON and REES, JJ., concur.

LeGRAND, J., concurs specially.

LeGRAND, Justice (concurring specially).

Because I disagree with much of what is said in division VI, I concur in the result only.