**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Alvin JORDAN, Defendant-Appellant.**

**No. 77–5059.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 10, 1977.

Decided Feb. 14, 1978.

---

Clarence M. Bradfield, Terry & Bradfield, Detroit, Mich., for defendant-appellant.

Philip M. Van Dam, U. S. Atty., Frederick Van Tiem, Chief Asst. U. S. Atty., Detroit, Mich., for plaintiff-appellee.

Before PHILLIPS, Chief Judge, EDWARDS, Circuit Judge, and GRAY,* Senior District Judge.

EDWARDS, Circuit Judge.

Appellant Jordan was convicted after jury trial on two counts of possession with intent to distribute a quantity of heroin and a quantity of cocaine. On appeal he contends that the evidence of his possession of the drugs (which had been seized under a search warrant issued by a Magistrate) was insufficient to support a conviction for possession. Since two witnesses testified that he admitted ownership of the drugs and the jury had a right to believe their testimony against his denial of any such admission, we do not need to examine in this opinion the variety of documentary and physical proofs from which the jury could also have inferred such possession.

Appellant's second issue is stated as follows:

Once the defendant has requested counsel during a custodial interrogation, can the government continue to question the defendant to elicit statements that may be admissible against him?

This case was argued not long after the Supreme Court had decided *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), wherein detectives, after *Miranda* warnings and after defendant's definite refusal to talk on advice of counsel, continued conversations with him which the majority of the Court held were the equivalent of continued interrogation prohibited by *Miranda*.

In our instant case, however, the Drug Enforcement Administration Agents who searched the house and seized the two quantities of narcotics upon which the indictment was based, left notes asking appellant to appear at their office in the Federal Building. When he did so, according to the testimony of the two Agents who were present, they advised him of his *Miranda* rights and presented him with a card for signature. At a hearing on appellant's motion to suppress, Agent Coleman, of the Drug Enforcement Administration, testified as follows:

* Honorable Frank Gray, Jr., Senior United States District Judge for the Middle District of Tennessee, sitting by designation.

Q The arrest took place at 1:00 o'clock?

A Yes, sir, that is approximately the time that he came into the building and was arrested.

Q And you took him down the hall, you advised him of his rights, fingerprinted him, photographed him. Then what happened?

A Then I—as a standard part of the arrest, I pulled out this form and I read to these rights, it gives all the rights, it is a paragraph. And then there is a part that says, "I have," or, "I had"—you can check the box, and in this case, I checked "had"—it says, "I had read to me the statement of my rights shown above."

Q Agent, I wonder if you would be good enough to read to the Court what portion of that form you read to Mr. Jordan on that day, using the same inflection that you used and using the same speed that you used on that particular day.

A Well, I will do it to the best I can, I will read it.

Q As you recall.

A "Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court or other proceedings. You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. In such a case, you have a right to have a court-appointed attorney present at the interrogation. If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer."

Q That is the—

A (Interposing) That is the first paragraph. And then there is a—

Q (Interposing) I know there is more in the form, agent; but what I am asking you at this point, and I want to make sure you are answering my question completely, I have asked you to read to the Court at approximately the same speed and approximately the same tone that portion of the form that you read to Mr. Jordan on that day.

Have you completed that?

A No; I read the whole thing that day.

Q You read more to him?

A Yes.

Q Would you continue reading?

A "You may waive the right to advice of counsel and your right to remain silent and answer questions or make a statement without consulting a lawyer if you so desire.

"I had"—and then checked the box —"read to me the statement of my rights shown above. I understand what my rights are and I elect to waive them. I am willing to answer questions and make a statement. I do not want a lawyer. I understand and know what I am doing. No promises or treats have been made to me and no pressure of any kind has been used against me. I was taken into custody at"—and then I filled in "1:00 o'clock P.M.," and then I filled in "4/8/75"—and "and have signed this document at—and I filled in "1:15 P.M., on" and then I filled in "4/8/75."

That is the extent of what I read to him that day, and I asked him to sign the form.

Q All right. What you just read, taking into account the interruption—and I interrupted you at the end of paragraph one—took you approximately one minute and 45 seconds to read. At the conclusion of that one minute and 45 seconds, what conversation, if any, did you have with the witness?

A He says, "I do want a lawyer. This says I don't. I don't want to sign that."

Q What else?

A Well, it is a common response because the form is outdated. So, I said, I just put on the form, "Refused to sign;" because no one can understand the form. But we still have to go through it. And when they read this, "I do not want a lawyer," they think they mean for the case, and it is hard to explain what the form means. So, I just put, "Refused to sign."

Q You didn't try to explain that, because it would be too hard to explain. So, you simply said, "Refused to sign," and then you proceeded; is that correct?

A No; as I recall, there were other parts of it that he didn't want to sign for, this part about—I think it was that part about the lawyer. I would be guessing if any of the rest of it bothered him—this part, "You may waive the right to advice of counsel." And he thought that to mean, again, that he would be waiving an attorney, like he was going to plead or something like that.

Q Did you clarify that for Mr. Jordan?

A I don't remember how much I went into it; but I do have a comment on here, "Refused to sign."

Q Did you have any other conversation with Mr. Jordan relative to that form or the information contained therein?

A Yes.

Q What was that?

A I said, "Well, do you understand the rights as far as your right to remain silent, that you can have a court-appointed attorney?"

He said, "Yes, I understand all of those rights."

I said, "By signing this, it doesn't mean that you are going to forfeit an attorney or anything like that."

He said, "I ain't signing nothing."

Q He said, "I ain't signing nothing."?

A Yes.

Q Did you have any further conversation?

A Yes, we did. I then told him—I did negotiate a form 202, which is called a personal history sheet. It is a two-page form which involves a defendant, a person being arrested, involves his date of birth, his place of birth, parents' names.

Q Before you describe that form, I would like to know: you immediately after this conversation that we have just referred to, then, proceeded to produce another form; is that correct?

A After he refused to sign, I put, "Refused to sign." I immediately put that aside and then I've got the fingerprints, photograph, and the statement of rights form out of the way, the next thing is the 202, and I brought that out.

Q Now, Agent, before we get into the form 202, I am a little puzzled by something. You said that he didn't—he said, "I do want a lawyer." And you, understanding that he had misunderstood the form, you simply wrote down at the bottom, "I do not want to sign."

A "Refused to sign."

Q "Refused to sign?"

A Yes.

Q And then you said that there was some more conversation and then he said, "I ain't going to sign nothing," and then you wrote down, "Refused to sign." At which point did you actually write down, "Refused to sign"?

A I don't know.

Q You don't know?

A No. I just wrote it down and that was that. I assured him that he was going to have an attorney, that he wasn't pleading to anything.

Agent Coleman, on cross-examination, further described the events at the time of arrest as follows:

Q Agent Coleman, you testified previously, at the beginning of Mr. McFadden's questioning of you, that you advised Mr. Jordan of his rights two times. When was the first time that you advised him of his rights?

A When I officially placed him under arrest, with Agent Crep, as we entered the processing room. It is just like clockwork with me. It is standard procedure. I could never place anyone under arrest without saying those words that follow. It is automatic.

Q Did he have any questions with respect to the rights at that time? I am not talking about the later time that you had a paper; but at that time, did he have any questions?

A No, sir. After I read the rights, I asked, "Do you understand those rights?" And he said, "Yes, I do." He said that he had been arrested several times before, and that he was well acquainted with the idea that he didn't have to say anything.

Q Now we come to—I am not sure the exhibit number—when it came to the written waiver of rights form that you testified that you read to him, did he indicate at all that he desired an attorney present before you commenced any questioning of him?

A No. During my verbal advising of his rights earlier, I had told him what the arraignment was going to be and then he realized and said that he wouldn't need an attorney, and that his attorney was out of town, anyway. And I reassured him in my opinion that at an arraignment, I wouldn't think he would be discussing the case; but that if he didn't have an attorney, the magistrates usually would have—

Q (Interposing) I am not talking about the arraignment, I am talking about the questioning of him—what I specifically want to refer to is the line on Exhibit A where you testified that you crossed out the words, "I do not want a lawyer."

A Yes.

Q Now, with respect to that sentence on that sheet, would you tell us, please, what conversations you had with Alvin Jordan regarding that phrase in that form?

A Yes; as I recall, he says, "But, Mr. Coleman, I do want a lawyer." And I explained to him that he would have a lawyer for the trial but—the form, I told him the form was outdated, "If you want to cross that out and initial it, that, you know, you are not stipulating that you do not want a lawyer for your trial, I will cross it out." And I did that and Agent Crep and I initialed it.

But there was other problems. He had a problem with the statement, "You may waive the right to the advice of counsel and your right to remain silent," he had a problem with that. And he just didn't want to sign, and I didn't press the issue. And I just moved on along, because most of the defendants who read this form have the same problem and I am used to it, and they don't sign it.

Q Would you explain for us, please, what that problem is?

A Well, the same thing, they think by signing this that they are waiving something. The word "waiver" gets to them. And—

Q (Interposing) Well, isn't that what it says, that they would be waiving?

A As I see this, the only time I would use this form is if I were about to attach it to a formal statement such as someone going into the grand jury or something like that. I would use it as a formal statement to have your attorney there during a testimony or something.

Q Did Alvin Jordan indicate to you that before you did any questioning of him, that he wanted an attorney present?

A No; that wasn't the problem. He didn't care about having an attorney there now, he just wanted an attorney for the trial.

Q So, you are not—your testimony is not that he wanted an attorney present that day, but he was concerned about what would happen after this at the time if he wanted an attorney for a trial?

A No, he wasn't concerned about having an attorney that day. He never said that. Just that he was out of town for the arraignment.

As for the arrest process, he didn't care about having an attorney there; at least that is what he said. What he was concerned with was signing something without the advice of an attorney, he didn't want to sign anything. This is exactly what he said.

Agent Coleman, on redirect examination, related appellant's subsequent admission that he possessed the drugs in question:

Q You had a discussion, you say, about the fact that there were two names on the warrant, there was a Paulette Henderson and an Alvin Jordan; is that correct?

A Yes.

Q Were there any other names on the warrant?

A No, not as defendants.

Q What was the conversation as it relates to the names of the defendants on the warrant?

A He said, "What do you want her for? She doesn't have anything to do with it. Why is her name on this warrant?"

It went on, if you would like for me to elaborate.

Q I would like for you to repeat as much as possible what happened next, and I am trying to follow this chronologically if you will tell me. You sat down at the desk. You were still sitting at the desk. Mr. Jordan came back after washing the fingerprint ink off. You handed him the warrant. Tell me what happened thereafter in proper sequence. There was a conversation, and I would like for you to recall, if you can recall, the sequence.

A There were certain things I can't recall the sequence. He said, "She is my common-law wife, girl friend." I had just finished filling out the 202, asking him other questions, and I asked him, "Does she also live on Bassett with you?," as he had given that address.

Q So, that was sort of like a continuation of the 202?

A Yes. And he said yes.

And we talked about the search warrant and the articles that were seized in the room. And we talked about the room with his clothing in it and her clothing in it, and he said, "Yes, it is my common-law wife." And I remember thinking at least I am not going to have to hear in court that he doesn't live at the address, because at least he is admitting that.

He talked about her pregnancy. Very definitely, he said that she was pregnant and that she was on the verge of an emotional breakdown. And I said, "Well, I certainly know how that is, going through a pregnancy myself with my wife."

Q Your wife was in fact pregnant at that time?

A Yes, she was. And I mentioned that and I said, "I know what you mean, an arrest at this point wouldn't be a very pleasant thing to endure but I do have an arrest warrant for her and we are going to negotiate the arrest in some manner, whether it is a magistrate going to a hospital bed or whatever, we are going to take care of it."

And he said, "But I don't understand what you want with my wife, she doesn't have anything to do with it. The dope there was my dope, it wasn't hers and she doesn't even know that I am doing this. So, why do you have her name in the warrant?"

He wanted an explanation, which I gave. I said, "Well we seized definite pieces of identification from Paulette Henderson, definite articles that show residency," and I said, "This is standard procedure when you have a search warrant, if there are drugs found, the occupants of that residence are charged unless it is determined who—everyone is charged originally because at that point an agent might not know what is going on."

But he told me that she didn't know anything about it, that she didn't even know that he was selling heroin, and that all the stuff in the house, she didn't know anything about, and that she should not be charged.

And I said, "Well, I will talk to the United States Attorneys; and if this is your admission, we will move for dismissal on the grounds of what you said, and we won't charge her." And this is what I did. And that is what happened, it was dismissed.

Appellant testified concerning these same events. On direct examination the following testimony was developed:

Q How would you characterize your demeanor while you were talking to them?

A Well, it was nothing official. It was just like off the cuff, man-to-man. You know, everybody was jiving around, you know.

Q And you heard in court this morning the two agents that testified about your making a statement to them. Is there anything that you want to comment on about that?

A Yes; the only statement that I made was that the house belonged to me, and that I was responsible for the house. That was the only statement that I made.

Q Did you ever make a statement to them about your wife?

A Yes; the statement I made was that she was pregnant and she didn't have nothing to do with whatever was happening. If there was a charge to be made, charge me with it.

On cross-examination the same issues were explored further:

Q As a result of that conversation with Mr. Coleman about the fact that Mrs. Henderson was pregnant, did he agree to do anything?

A Yes; he said that he would talk this over and see what he can do. And evidentially whatever was done, he did it.

Q All right. Now, Mr. Jordan, you were aware that you are charged in this case with possession with intent to distribute certain controlled substances and, specifically heroin and cocaine; you are aware of that, are you not?

A Yes.

Q Did you, during that conversation with Mr. Coleman or at any other time with Mr. Coleman, advise Agent Coleman that in fact those controlled substances belonged to you?

A No, never.

Q Now, Mr. Jordan, we are talking about a conversation that you had with the agent at the time that you indicated to him that your common-law wife was pregnant; is that correct?

A Yes.

Q You did not at that time indicate to him that the heroin or the cocaine was yours; is that correct?

A No, I never indicated that the heroin or cocaine was mine or knew anything about it.

Q Did you indicate that to him at any other time?

A No.

Q All right. Mr. Jordan, prior to the time that you had the conversation with Agent Coleman at the time that you surrendered yourself into his custody, did he advise you of your constitutional rights?

MR. MILLIKIN: Your Honor, excuse me. I fail to see the relevance of the question, in light of the defendant's own statement that he made no statement against his own admission. The Government intends to introduce only that testimony if he denies making it. I fail to see how this has any relevance at this time.

MR. McFADDEN: I am directing myself to the brief, and that was in paragraph four, stating that *Miranda* warnings were not given. I think that it is necessary in support of the motion

that the full evidence be admitted in support of all of the allegations in that motion.

MR. MILLIKIN: Your Honor, both here and in the defendant's brief, the defendant has taken the position that he didn't make any statement, as I understand it, and if he did he wasn't advised of his *Miranda* warnings. I don't think he can have it both ways.

MR. McFADDEN: I think I can. I think I am entitled to this in criminal law, and in any other field.

THE COURT: I will take the testimony and you can argue that point afterward.

MR. McFADDEN: Thank you.

Q (By Mr. McFadden, continuing) Mr. Jordan, the question was: at the time you surrendered yourself into the custody of Agent Coleman and prior to the time of the conversation that we have just been discussing, did Agent Coleman or any other person advise you of your constitutional rights?

A No.

Q Now, we were talking about advising you of your constitutional rights, Mr. Jordan. Do you know what that means?

A Yes.

Q And what does that mean to you?

A That anything that I said could be held against me later.

Q All right. And certain other things?

A Yes.

Q This would be advising you of exactly what your rights are, completely?

A Yes.

Q And no one did that prior to the time of the conversation with Agent Coleman; is that correct?

A Right. There was just a casual conversation, man-to-man.

Q This was man-to-man?

A Yes.

Q Where did it take place at?

A I guess in his office. I'm not sure what floor it was on, maybe the ninth floor of this building, I'm not sure.

Q In any event, it was a place where you surrendered yourself to his custody?

A Yes.

Q You say it was a man-to-man conversation. Would you elaborate on that and tell us what you mean by "man-to-man conversation"?

A Well, this was like—well, nothing was really specific, it was like off the record. We were just talking, you know, about everything.

Q And because you were off the record and talking about everything, you felt free to talk about Mrs. Henderson with him; is that correct?

A Sure.

The District Judge denied the motion to suppress on the basis of the following reasoning:

THE COURT: The matter comes to the Court under rather strange circumstances because the defendant here has testified that he was never warned of any constitutional rights and, in addition, that he never made the statements that he allegedly made and that no such discussion took place regarding his living in the home or his ownership of the items sought to be suppressed. So, we do not have two versions of what may have occurred, but, on the contrary, one version which indicates nothing occurred and another which indicates that there was a conversation which involved the giving of rights and the making of certain inculpatory statements.

It would appear to me that the testimony of the agent here is the more credible. He has testified with some specificity as to what occurred, and the Court sees no reason to discredit or disbelieve that testimony.

There is some concern, necessarily, because of problems raised by the testimony itself. It appears, in the first instance, that the defendant here voluntarily surrendered himself and was arrested by the agents, and was given at least a partial

explanation of his constitutional rights contemporaneous to his arrest. Subsequently, after he had been fingerprinted and photographed, there was read to him a form which the agent himself admits is rather confusing, particularly since it can be interpreted easily to reflect an intention to waive an attorney at all stages of the proceedings, as opposed to waiving the presence of an attorney during the course of any questioning that may occur.

The concerns of the defendant here with regard to the waiver appear to me to indicate that there was an intelligent appraisal of the form and an understanding of his rights. I bear in mind that the defendant while testifying indicated a high caliber of intelligence. I note also in the 202 form he has had some college work. It is obvious that he is an intelligent person. His vocabulary would indicate appreciable education. So, I am willing to accept the proposition that even though he did not wish to sign the form, that he understood his constitutional rights.

But importantly, I think, and the real crux of this case is that although he was not told or asked, "Do you wish to make a statement?", or anything of that sort, as a matter of fact, as far as I could determine from the testimony, no questions were asked regarding his involvement in this matter. He voluntarily stated that the young lady who lived with him and who he calls his common-law wife was not involved, that it was his drugs, and indicated he was concerned because of her physical condition and the effect an arrest might have on her. That I think, is the reason for making the statement; not because he didn't understand his rights, not because he didn't feel that any statement at that time could not be used against him; but, rather, to protect his common-law wife.

And that cannot be laid to the door of the agents. As indicated, the Court itself questioning in this area so as to assure itself that these were voluntary statements without any prior questioning by the officers, is satisfied that that was the case.

I see no effort of any attempt to trick or to lull the defendant. On the contrary, the agents appeared to have acted properly.

And, so, I will deny the motion to suppress the statements.

The credibility findings of the District Judge, who had an opportunity to see and hear these witnesses, have great weight with this court. Accepting the testimony of Agent Coleman as credible, as the District Judge did, appellant was given full *Miranda* warnings but thereafter never asked for the presence of an attorney at the processing of the arrest. There was no violation of either *Miranda v. Arizona*, 384 U.S. 346, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), in the agent's action in showing appellant a copy of the arrest warrant. The District Judge held that this was not the equivalent of interrogation, and we agree. *See Brewer v. Williams, supra* at 399, 97 S.Ct. 1239–40. The District Judge also found that appellant's admission that the narcotics were his was voluntary. We find no grounds in this record for holding this finding to be clearly erroneous as a matter of fact or wrong as a conclusion of law.

The judgment of conviction is affirmed.