State of Nebraska, appellee, v.
Troy E. Grimes, appellant.
___ N.W.2d ___

Filed September 29, 2015.    No. A-14-181.

1. **Motions to Suppress: Confessions: Constitutional Law: Appeal and Error.** In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, an appellate court applies a two-part standard of review. With regard to historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination.

2. **Confessions.** To be admissible, a statement or confession of an accused must have been freely and voluntarily made.

3. **Confessions: Due Process.** The Due Process Clause of U.S. Const. amend. XIV and the due process clause of Neb. Const. art. I, § 3, preclude admissibility of an involuntary confession.

4. **Confessions.** Whether a confession or statement was voluntary depends on the totality of the circumstances.

5. **Confessions: Police Officers and Sheriffs: Due Process.** Coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the 14th Amendment.

6. **Confessions: Proof: Appeal and Error.** The State has the burden to prove that a defendant's statement was voluntary and not coerced. In making this determination, an appellate court applies a totality of the circumstances test.

7. **Confessions: Appeal and Error.** Factors to consider in determining whether a defendant's statement was voluntary and not coerced include the atmosphere in which the interrogation took place, the demeanor of the interrogation, the interrogator's tactics, the details of the interrogation, the presence or absence of warnings, physical treatment, prior

history with the police, age, intelligence, education, background, and any characteristic of the accused that might cause his or her will to be easily overborne.

8. **Confessions.** A confession must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.

Appeal from the District Court for Douglas County: Gary B. Randall, Judge. Affirmed.

W. Patrick Dunn for appellant.

Jon Bruning, Attorney General, and George R. Love for appellee.

Irwin, Inbody, and Pirtle, Judges.

Inbody, Judge.

## I. INTRODUCTION

Troy E. Grimes appeals his jury-based conviction of possession of a firearm by a prohibited person. He contends that the district court erred in allowing the State to adduce evidence of statements, made by him in his postarrest interrogation, obtained in violation of his constitutional rights. Specifically, he contends police threatened to arrest his mother in order to obtain inculpatory statements from him.

## II. STATEMENT OF FACTS

On January 17, 2013, at approximately 9 a.m., three Omaha police officers went to contact Grimes, who was living at his mother's house, based on information obtained in a separate and unrelated investigation. Present at the house at the time officers arrived were Grimes; his mother, Barbara Grimes; Grimes' girlfriend; and a friend of Grimes', who was allowed to leave the home after it was determined that he did not have any outstanding warrants. Barbara granted the officers' request to search the house. During the search, an unregistered gun was found in the basement of the house, wrapped in a black

bag and placed in an old, unused furnace. The gun had eight live rounds inside the magazine and chamber. Grimes was arrested and transported to the police station and taken to an interview room where Steven Kult, an officer with the Omaha Police Department's child victim unit, conducted an interview of Grimes. A video recording was made of this interview which was received into evidence during the suppression hearing, and a redacted copy of the interview was received into evidence at trial.

A review of the video recording establishes that Kult began interviewing Grimes at 10:47 a.m. The interview began with Kult asking Grimes questions about his medical status, education, alcohol and drug use, amount of sleep the previous night, work, and hobbies. At 10:51, Kult advised Grimes of his *Miranda* rights, which Grimes waived. At 10:53, Kult explained to Grimes that the reason for the interview was an allegation by Grimes' two daughters of child sexual abuse and Kult informed Grimes that the police were not proceeding with that investigation; however, Kult informed Grimes that during the children's interviews regarding the abuse, the children talked about marijuana use in the home and described seeing Grimes with a gun in the home. Kult told Grimes that because of these disclosures, the police had to follow up at Grimes' home, and that these disclosures are what led to the finding of the gun. At 10:56, the following colloquy occurred between Kult and Grimes:

> [Kult:] So, I guess that I'd like to talk to you a little bit about the gun, 'cause what I don't want to end up happening is anything going back on mom, 'cause the gun's in a common area of the house, so I'll just ask you straight up: Was it your gun?
>
> [Grimes:] No, but I'm not gonna let my mom take the rap for it.
>
> [Kult:] OK.
>
> [Grimes:] If it—you know—if it comes to that then, fuck that, then I'll take it.

[Kult:] Well, they're gonna—right now the crime lab's pulling the gun out and they're gonna do DNA. You know your DNA's on file, and are we going to find your DNA on the gun?

[Grimes:] You shouldn't.

[Kult:] I mean it's gotta be straight up yes or no, 'cause they're gonna know, you know.

[Grimes:] No, I'm sayin' you shouldn't.

[Kult:] I mean if you ever even touched the gun, it's gonna be on there for years.

[Grimes:] Oh. Um, I don't know. Why, we'll just say yes.

[Kult:] Come on, I mean, your girls weren't trying to throw you under the bus or nothing. They, they weren't trying to fuck you and put you in this position. They were just telling a story, man.

[Grimes:] Yeah, it's cool, you know. Like I said, man. Just, I don't know, just leave my mom out of it, man.

[Kult:] I would, I want to leave your mom out of it.

[Grimes:] All right.

[Kult:] But we, you and I got to establish who's the gun belong to.

[Grimes:] It's mine, it's mine.

[Kult:] OK. I'm not trying to hem you up. But I am trying to keep your mom out . . . of it.

[Grimes:] Well, we're trying to do the same thing, you know. Just leave my mom out of it . . . .

[Kult:] 'Cause your mom's a sweetheart. I'm sorry she had to go through all of this today.

[Grimes:] It's cool, man.

. . . .

[Grimes:] So what it is, is this, man like, my mother took [undecipherable] 'cause you said this is a common area, my mom [undecipherable] I'll say that it's mine. . . .

. . . .

[Grimes:] So, what I'm saying, is though like, . . . so, say my DNA ain't on it, man, and you know what I mean, it's just not, and then, so, you all would try to say it's my mom's, then, right, 'cause it was found in her house. That's where I'm going with this. So somebody has to be responsible for that gun.

[Kult:] Someone's gotta be responsible for the gun 'cause it didn't grow legs or just . . . walk into your house.

[Grimes:] That's what I'm saying.

. . . .

[Grimes:] But even let's just say that even that, I'm just saying though, if my DNA wasn't on there, but it was found in my mom's house, so what, they would try . . . .

[Kult:] We gotta . . . something's gotta happen with the gun.

[Grimes:] Right. So someone has to. That's what I'm saying, someone has to be responsible for the gun.

. . . .

[Kult:] Is it fair to say that, I mean, that it's . . . your gun . . . for protection, or is it your gun that you, I mean, you just, if you like guns, or are you holding it for someone?

[Grimes:] I mean, that's what I'm saying though, you're asking about at this point it don't matter, and I'm just saying that 'cause my mom's not going down for that gun and so I'm saying its mine. That's what it is.

During the interview, Kult also explained that the gun may be associated with another crime and Grimes told Kult that he had been holding the gun for a friend named "Scooby" for a little over a year. Kult and Grimes took a break from 11:09 through 11:20 a.m., after which time Grimes signed a waiver for the collection of a DNA sample. Another break was taken between 11:23 and 11:29, after which a DNA swab was collected from Grimes. At 11:43, Grimes was transported to jail, concluding the interview and the recording.

Although Grimes was in the interview room for about an hour, the actual interview lasted for about 20 minutes. During the interview, Grimes did not ask Kult to stop the questioning and did not ask for an attorney. On February 8, 2013, Grimes was charged with possession of a deadly weapon by a prohibited person, a Class ID felony, in violation of Neb. Rev. Stat. § 28-1206 (Cum. Supp. 2014).

In April 2013, Grimes filed a motion to suppress any statements made by him to law enforcement personnel during the January 17, 2013, custodial interrogation. He alleged (1) that law enforcement personnel interrogated him with the intent to elicit incriminating responses without first having advised him of his *Miranda* rights; (2) that law enforcement personnel employed tactics of coercion and duress to obtain incriminating information from him and offered improper inducements and used threats of incarceration in order to obtain incriminating information from him and that thus, his statements were not freely, voluntarily, and intelligently given; and (3) that his statements were obtained in violation of the U.S. and Nebraska Constitutions.

A suppression hearing was held on May 20, 2013. At the start of the hearing, Grimes' counsel made an oral motion to suppress a second, subsequent statement made by Grimes during a followup interview by Omaha police officer Scott Beran. The State had prepared to address both statements by Grimes, and the district court determined that the record was clear the suppression hearing was addressing both statements made by Grimes and that it was unnecessary for Grimes to file an amended motion to suppress. Kult and Beran, who had conducted the second interview of Grimes, testified at the suppression hearing.

Kult testified that he became involved in an investigation of Grimes when Grimes' 8-year-old and 6-year-old daughters were brought in by their maternal grandmother regarding allegations of sexual abuse. During the forensic interviews of the children, they disclosed that Grimes had a firearm in the

house. As a result of this disclosure, Kult, along with parole officers and two uniformed officers, contacted Grimes at his house; the firearm was located; and thereafter, Grimes was arrested and transported to the police station, where he was interviewed by Kult. Kult admitted that he never had any intention of arresting Grimes' mother and that a statement he had made concerning her was a line of questioning in the interview. Kult stated that although his questioning was not designed to be a threat, he let Grimes believe that his mother was still a suspect and might be arrested. A video recording of the interview was received into evidence.

Beran, a firearms task force officer, testified that on January 24, 2013, at approximately 9:46 a.m., he interviewed Grimes regarding the firearm found in Grimes' home. At the time of this interview, Grimes was still in custody and was interviewed in a room at a Douglas County correctional facility. There was no audio or video recording equipment in the room, so the 9-minute interview was not recorded. After Grimes waived his *Miranda* rights, Beran questioned Grimes about where he obtained the gun and attempted to obtain information about "Scooby"; Beran testified that Grimes had told Kult in the initial interview that he had obtained the firearm from "Scooby" in 2011. Grimes admitted that he did not have a friend named "Scooby" and that he gave a statement naming such individual because he did not want his mother to get in trouble. During the interview, Grimes did not ask for an attorney, and when he asked to go back to his cell, Beran ended the interview and no further questions were asked of Grimes after that time.

On May 28, 2013, the district court denied Grimes' motion to suppress. The district court found that Kult testified that he was assigned to investigate Grimes regarding a sexual assault and that during this investigation, Grimes' daughters testified that their "'father'" had a gun. The court noted that Grimes was specifically advised of his *Miranda* rights prior to being interviewed. The court then noted that at the opening of the

video-recorded interview, Kult stated to Grimes, "'What I don't want to end up happening is anything going back on Mom, because the gun was found in a common area of the house.'" Grimes denied the gun belonged to him but stated he would "take the charge," based on his not wanting to involve his mother in the investigation or in charges resulting from the unregistered gun's being in the home. During the interview, similar questions and answers were given. The district court found, in reviewing all of the evidence, that Kult's tactics in interviewing Grimes were not coercive, that there was no evidence Grimes' will was overborne, and that Grimes' action in originally lying about where he obtained the gun further raised credibility questions regarding the statements provided by Grimes. Additionally, regarding Grimes' statement to Beran on January 24, the district court found that Beran provided Grimes with his *Miranda* rights, rejected the proposition that Grimes' statement during the followup interview should be suppressed as fruit of the poisonous tree of the original statement given to Kult, and denied Grimes' oral motion to suppress this second statement to law enforcement.

Trial was held in early November 2013. The State and Grimes stipulated that Omaha police found a "Hi Point Model CF380 semiautomatic .380 auto caliber" pistol at Grimes' home on January 17; that an Omaha crime laboratory technician examined and test-fired the firearm, which resulted in a finding that the firearm operates as designed and will "fire live rounds of .380 Auto caliber ammunition in semiautomatic fashion." The parties further stipulated that Grimes had previously been convicted of a felony "on and before January 17, 2013." Kult's trial testimony did not discuss the sexual assault investigation or Grimes' children's statements. Instead, Kult testified that he began the current investigation after receiving information in an unrelated investigation that criminal activity was occurring at Grimes' home and then provided generally the same testimony as he provided at the suppression hearing. Likewise, Beran testified generally as

to the same facts as he did at the suppression hearing, but he also testified that during the second interview, Grimes did not provide names of any other individuals who may have placed the firearm in the furnace. Grimes preserved his objections to his two statements as previously raised and considered at the suppression hearing.

Barbara, Grimes' mother, testified in his defense. Barbara testified that on January 17, 2013, Grimes was living at her home. Also living at the house at that time were Grimes' girlfriend, who is the mother of two of Barbara's grandchildren, and both of those grandchildren. According to Barbara, several people had access to her home, including her brother; Grimes' male friend whom the officers allowed to leave; and her 24-year-old grandson. Barbara testified that she had never seen the gun that was recovered before it was shown to her at trial, had never seen Grimes with a gun, did not know the gun was in her home, and did not put the gun there.

The jury found Grimes guilty of the offense of being a felon in possession of a firearm, and thereafter, the court sentenced Grimes to 5 to 14 years' imprisonment with credit for 260 days served.

## III. ASSIGNMENT OF ERROR

Grimes' sole assignment of error is that the trial court erred in allowing the State to adduce evidence of statements, obtained in violation of his constitutional rights, which were made in his postarrest interrogation. In his brief, he assigned as error that police employed tactics of coercion, duress, threats, offers of inducements, and improper influence to obtain said inculpatory statements; however, he argued only that Kult's threats to arrest his mother were coercive, threatening, and improper influence.

## IV. STANDARD OF REVIEW

[1] In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, an appellate court applies a two-part standard of review. With regard to

historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination. *State v. Turner*, 288 Neb. 249, 847 N.W.2d 69 (2014); *State v. Seberger*, 279 Neb. 576, 779 N.W.2d 362 (2010).

## V. ANALYSIS

Grimes contends that the trial court erred in allowing the State to adduce evidence of statements made by Grimes in his postarrest interrogation, because police employed tactics of coercion, threats, and improper influence to obtain those statements, in violation of his constitutional rights. He argues that under the totality of the circumstances, the tactics employed by the police, especially the repeated threat from Kult to arrest Grimes' mother if Grimes did not accept responsibility for possession of the gun, constituted coercive conduct, threats, or improper influence, rendering his confession involuntary.

### 1. Nebraska Law

[2-7] To be admissible, a statement or confession of an accused must have been freely and voluntarily made. *State v. Seberger, supra*. The Due Process Clause of U.S. Const. amend. XIV and the due process clause of Neb. Const. art. I, § 3, preclude admissibility of an involuntary confession. *State v. Turner, supra*. Whether a confession or statement was voluntary depends on the totality of the circumstances. *Id.*; *State v. Seberger, supra*. Coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the 14th Amendment. *State v. Turner, supra*; *State v. Seberger, supra*. The State has the burden to prove that a defendant's statement was voluntary and not coerced. *State v. Turner, supra*; *State v. Seberger, supra*. In making this determination, we apply a totality of the circumstances test. *State v. McClain*, 285 Neb.

537, 827 N.W.2d 814 (2013). Factors to consider in determining whether a defendant's statement was voluntary and not coerced include the atmosphere in which the interrogation took place, the demeanor of the interrogation, the interrogator's tactics, the details of the interrogation, the presence or absence of warnings, physical treatment, prior history with the police, age, intelligence, education, background, and any characteristic of the accused that might cause his or her will to be easily overborne. See, *id*.; *State v. Erks*, 214 Neb. 302, 333 N.W.2d 776 (1983).

In *State v. McClain, supra*, the Nebraska Supreme Court considered the defendant's claim that his confession was inadmissible because it was involuntary. In applying a totality of the circumstances test, the court noted that the defendant was interviewed in what appeared to be a standard interrogation room, the interrogator's questioning techniques were not improper even though he used the phrase "'cold blooded killer,'" the confession was just 1½ hours long, and the video showed that the defendant was "intelligent and thoughtful, that he was aware of why he was in the room, and that he too was trying to get information, specifically the extent of the interrogator's knowledge about the crimes." *Id.* at 548, 827 N.W.2d at 825-26. The court stated, "After viewing the interrogation . . . we conclude that McClain's will was not overborne and that his confession was voluntary." *Id.* at 547, 827 N.W.2d at 825.

[8] Moreover, "a confession must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *State v. Erks*, 214 Neb. at 305-06, 333 N.W.2d at 779. One such threat or promise is one against a third party, generally a defendant's close relative or family member. For example, in *State v. Erks, supra*, the Nebraska Supreme Court affirmed the district court's suppression of a portion of the statements made by the defendant, who was accused of a crime of a sexual nature, which statements were

made after indications that the police who sought to get help for him would also protect him and his family from embarrassment. The Supreme Court found that the defendant could easily have been influenced to confess by those indications by police and that the district court was not clearly wrong in finding that the statements made subsequently to the inducements were not made voluntarily.

Another case in which the Nebraska Supreme Court considered threats against a third party, albeit in the context of a Fourth Amendment consent to search, is *State v. Walmsley*, 216 Neb. 336, 344 N.W.2d 450 (1984). In *Walmsley*, a sheriff was investigating a report of "'strange looking weeds'" growing behind the defendant's house and, upon arriving at that house, threatened to arrest the defendant's wife. 216 Neb. at 336, 344 N.W.2d at 451. The trial court found that the sheriff's comments constituted duress or coercion of a psychological nature and to such an extent that the defendant's consent to the search was impossible under the circumstances. In upholding the trial court's grant of the defendant's motion to suppress, the Nebraska Supreme Court stated that the threat of "[i]ncarceration of a wife and concern at separation from children while their parents are in custody has to produce a mental state gravely and adversely affecting one's ability to make decisions." *Id.* at 341, 344 N.W.2d at 454.

## 2. CASE LAW FROM OTHER JURISDICTIONS

Although the case law in Nebraska is limited on the issue of the impact of threats or promises against a close relative of a defendant on a confession, many more federal and state cases have considered the issue. We include some of those cases. For an extensive list, see Annot., 51 A.L.R.4th 495 (2011).

In *Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S. Ct. 917, 9 L. Ed. 2d 922 (1963), the U.S. Supreme Court found that it was "abundantly clear" that the defendant's oral confession was not voluntary where it "was made only after the police had told her

that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate'" with officers. Similarly, in *United States v. Tingle*, 658 F.2d 1332, 1334 (9th Cir. 1981), the defendant's confession was involuntary where it was made after law enforcement told her that a lengthy prison term could be imposed, that she had a lot at stake, and that she would not see, or might not see, her child "for a while" if she refused to cooperate. See, also, *Rogers v. Richmond*, 365 U.S. 534, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961) (defendant's confession made after interrogating officer threatened to bring defendant's wife in for questioning was reversed because lower court had applied wrong standard in analyzing admissibility of confession).

More specific to the facts involved in the instant case are those cases which analyze threats to arrest an accused's family member or close relative. These cases can generally be classified into three groups: (a) those where the threats are not found to be coercive, (b) those where the threats are found to be coercive, and (c) those where the law enforcement officer has offered the defendant a "good deal."

### (a) Threats Were Not Coercive

It is widely accepted that a threat by law enforcement to arrest an accused's family member is not coercive if there is probable cause to arrest the family member. *U.S. v. Ortiz*, 943 F. Supp. 2d 447 (S.D.N.Y. 2013); *U.S. v. Johnson*, 351 F.3d 254 (6th Cir. 2003) (threat to arrest suspect's sister was not coercive where police had probable cause to arrest sister); *Thompson v. Haley*, 255 F.3d 1292 (11th Cir. 2001) (threat to arrest suspect's girlfriend did not render suspect's confession involuntary where police had probable cause to do so); *Allen v. McCotter*, 804 F.2d 1362 (5th Cir. 1986) (threat to arrest defendant's wife did not render defendant's confession involuntary where police had probable cause to arrest her). See, also, *U.S. v. Ortiz*, 499 F. Supp. 2d 224, 232-33 (E.D.N.Y. 2007) ("[i]t is not coercive to threaten a suspect's

family member with arrest to secure a *Miranda* waiver from the suspect if, [sic] there is probable cause to arrest the family member"); *People v. LaDuke*, 206 A.D.2d 859, 614 N.Y.S.2d 851 (1994) (it is not necessarily improper tactic for police to capitalize on defendant's reluctance to involve his family in pending investigation especially where police have valid legal basis to carry out their threats to arrest defendant's wife and father); *State v. Garcia*, 143 Idaho 774, 152 P.3d 645 (2006) (defendant's consent to search was not coerced even after officer told him that if defendant handed over marijuana, he and his coworkers would be cited and released, but that if he did not, they would be arrested, where there was probable cause to do so).

In *U.S. v. Jackson*, 918 F.2d 236 (1st Cir. 1990), the First Circuit Court of Appeals held that the defendant's confession was voluntary where police informed him that his sister had been arrested for a gun violation. The court noted that there was no evidence the defendant was subjected to direct threats or promises and that even if police did use an implied "'threat'" or "'promise'" that his sister might be caused or spared harm, depending on whether or not the defendant made admissions, the court still could not conclude the defendant's will had been overborne. *Id.* at 242. The court noted that "any psychological pressure exerted on [the defendant] related to an adult sibling, not a child," and that there was no evidence that the defendant and his sister had an especially close relationship or that the defendant was "unusually susceptible to psychological coercion on that account or any other, particularly in light of [the defendant's] very substantial previous experience with the criminal justice system." *Id*. Considering the totality of these circumstances, the First Circuit Court of Appeals held that the defendant "did not lose volitional control, nor was his will overborne." *Id*.

### (b) Threats Were Coercive

However, where a threat by law enforcement to arrest an accused's close relative or family member is made without

probable cause to do so, the threat is coercive. *U.S. v. Finch*, 998 F.2d 349 (6th Cir. 1993) (information defendant provided to police concerning location of drugs was involuntary where it was provided after police threatened to arrest his mother and girlfriend unless he confessed, where no probable cause to carry out threat existed); *U.S. v. Munoz*, 987 F. Supp. 2d 438 (S.D.N.Y. 2013) (defendant's consent to search was involuntary where police told defendant that other occupants of his apartment, including his father and brother, would be arrested if firearm was located in apartment he shared with them unless defendant consented to search, where police had no probable cause to arrest other occupants); *U.S. v. Ortiz*, 943 F. Supp. 2d 447 (S.D.N.Y. 2013) (defendant's statements were involuntary where police threatened to arrest defendant's mother and elderly aunt but lacked probable cause to do so); *U.S. v. Andrews*, 847 F. Supp. 2d 236 (D. Mass. 2012) (threat to arrest suspect's elderly, ill mother rendered suspect's confession involuntary where there was no probable cause to arrest her); *U.S. v. Guzman*, 724 F. Supp. 2d 434 (S.D.N.Y. 2010) (threat that defendant's girlfriend would be arrested until he consented to search rendered consent and subsequent statements by defendant involuntary); *State v. Schumacher*, 136 Idaho 509, 517, 37 P.3d 6, 14 (Idaho App. 2001) ("threats to prosecute a defendant's loved one when there is no legitimate basis to do so may be coercive and can render a confession involuntary"); *State v. Corns*, 310 S.C. 546, 552, 426 S.E.2d 324, 327 (S.C. App. 1992) (defendant's confession was involuntary due to "veiled threats" made by officers against defendant's family, i.e., that his wife could be arrested and that their children could be taken from them); *State v. Davis*, 115 Idaho 462, 767 P.2d 837 (Idaho App. 1989) (confession was involuntary where prosecutor told defendant that defendant's mother was being held due to defendant's refusal to confess and where charges against mother were later dismissed for lack of evidence); *People v. Rand*, 202 Cal. App. 2d 668, 21 Cal. Rptr. 89 (1962) (defendant's

confession was involuntary where it was obtained after officer threatened to arrest defendant's wife and put his children in juvenile hall); *People v. Matlock*, 51 Cal. 2d 682, 697, 336 P.2d 505, 512 (1959) (recognizing that confession coerced by threat to "'bring the rest of the [defendant's] family in'" was involuntary).

For example, in *Harris v. South Carolina*, 338 U.S. 68, 69 S. Ct. 1354, 93 L. Ed. 1815 (1949), the defendant's statement was involuntary based on a totality of the circumstances including the threat by a sheriff to arrest the defendant's mother. In response to the threat, the defendant replied, "'Don't get my mother mixed up in it and I will tell you the truth.'" *Id.*, 338 U.S. at 70. In finding the defendant's statement to be involuntary, the U.S. Supreme Court relied upon the "systematic persistence of interrogation, the length of the periods of questioning, the failure to advise the [defendant] of his rights, the absence of friends or disinterested persons, and the character of the defendant," who was illiterate and was not informed of his *Miranda* rights. *Harris v. South Carolina*, 338 U.S. at 71.

Further, even if the threat is phrased in the language of promise, it remains an implied threat and renders the defendant's statement involuntary. *United States v. Bolin*, 514 F.2d 554 (7th Cir. 1975). In *Bolin*, the Seventh Circuit Court of Appeals found that the defendant's consent to search his home made after his arrest and during custodial interrogation was involuntary where the defendant signed a consent form only after officers told him that "'if he signed the search waiver,'" they would not arrest his girlfriend. 514 F.2d at 559. The court recognized that although the officers' statement concerning the potential arrest of the defendant's girlfriend, whom officers did not have probable cause to arrest, was "phrased in the language of promise, there is no question that it was in fact an implied threat that if the consent were not signed the woman would be arrested," and that the defendant understood the statement as a threat. *Id*. at 560.

Similarly, in *People v. Trout*, 54 Cal. 2d 576, 354 P.2d 231, 6 Cal. Rptr. 759 (1960), *overruled on other grounds, People v. Cahill*, 5 Cal. 4th 478, 853 P.2d 1037, 20 Cal. Rptr. 2d 582 (1993), the defendant's confession was involuntary where it was obtained after the police made either express or implied threats or promises that if he confessed, his wife, whom they had no grounds to hold, would be released from custody to care for their children.

> Before a confession may be used against a defendant the prosecution has the burden of showing that it was voluntary and was not the result of any form of compulsion or promise of reward, and it is immaterial whether the pressure or inducement was physical or mental and whether it was express or implied.

*Id*. at 583, 354 P.2d at 235, 6 Cal. Rptr. at 763.

### (c) "Good Deal"

However, offering a "'good deal,'" such as a loved one's freedom from arrest, does not automatically render a statement involuntary. *U.S. v. Munoz*, 987 F. Supp. 2d 438, 445 (S.D.N.Y. 2013). Courts have considered a defendant's statement to be voluntary where it is given in exchange for a promise that police will not arrest or pursue charges against a family member or close relative whom they have probable cause to arrest or where the defendant's statement is motivated by a desire to protect or by concern for another. See, *U.S. v. Memoli*, 333 F. Supp. 2d 233 (S.D.N.Y. 2004) (upheld defendant's consent to search given in exchange for promise that police would not arrest or pursue charges against defendant's girlfriend, whom they had probable cause to arrest); *Allen v. McCotter*, 804 F.2d 1362 (5th Cir. 1986) (defendant's confession was voluntary where defendant was told that charges could be filed against his wife and defendant was motivated by his desire to prevent good faith arrest of his wife); *United States v. Jordan*, 570 F.2d 635 (6th Cir. 1978) (statements made by defendant which were motivated by desire to protect

pregnant common-law wife whose name was on arrest warrant were held to be voluntary); *United States v. Culp*, 472 F.2d 459 (8th Cir. 1973) (defendant's consent to search was voluntary where defendant refused to cooperate in search until promised that his wife, who had been arrested with him, would be treated leniently); *United States v. McShane*, 462 F.2d 5 (9th Cir. 1972) (defendant's confession was voluntary where it was motivated by his desire to spare his girlfriend ordeal of questioning and confinement); *Vogt v. United States*, 156 F.2d 308 (5th Cir. 1946) (defendant's confession was not rendered involuntary by officers' telling defendant they were going to bring his wife to jail for questioning); *State v. Schumacher*, 136 Idaho 509, 517, 37 P.3d 6, 14 (2001) ("a suspect's confession is not involuntary merely because it was motivated by the desire to prevent a good faith arrest of a loved one"); *People v. Steger*, 16 Cal. 3d 539, 546 P.2d 665, 128 Cal. Rptr. 161 (1976) (defendant's confession was voluntary where defendant's speaking to police was motivated by her desire to free her husband); *People v. Montano*, 184 Cal. App. 2d 199, 7 Cal. Rptr. 307 (1960) (defendant's confession was voluntary where motivated by concern for his girlfriend and pregnant sister-in-law); *People v. Mellus*, 134 Cal. App. 219, 25 P.2d 237 (1933) (defendant, who was charged with stealing chickens, made involuntary confession after officers told him that if he refused to make statement, they would lock up his mother and accuse her of being implicated in thefts).

For example, in *United States v. Charlton*, 565 F.2d 86 (6th Cir. 1977), the Sixth Circuit Court of Appeals held that a father's confession motivated by anger at the arrest of his 20-year-old son and desire to protect his son was not coerced. The court stated, "Obviously anyone who knows his rights and determines to confess does so for a reason. That the defendant's reason was to protect his son does not, in our judgment, render his confession involuntary or necessitate a finding that he was coerced or that his will was overborne." *Id.* at 89. Additionally, in *People v. Barker*, 182 Cal. App. 3d 921, 227

Cal. Rptr. 578 (1986), a defendant's confession was voluntary where a detective agreed not to charge the defendant's girlfriend in exchange for the defendant's truthful testimony, after the defendant initiated the subject of leniency and where the detective never told the defendant that he would arrest the defendant's girlfriend if the defendant did not cooperate. The court rejected the defendant's argument that the detective's failure to expressly tell the defendant that he did not intend to charge the defendant's girlfriend constituted an implied threat to charge her.

More factually similar to the instant case is *People v. Abbott*, 156 Cal. App. 2d 601, 319 P.2d 664 (1958), wherein the Second District Court of Appeal held that even if the defendant, who was charged with theft, had a choice between making a statement that might result in the release of a woman with whom he had been living and remaining silent and leaving her under suspicion as an accomplice, the defendant's confession was voluntary where the defendant's principal motive for the confession had been that it would probably result in her exoneration and where officers offered the defendant no bargain and had not threatened to prosecute the woman if he refused to make a statement.

### 3. Application to Instant Case

In the instant case, Kult did not tell Grimes that if he did not confess, his mother would be arrested; nor did he tell Grimes that if he did confess, his mother would not be arrested. When Kult told Grimes that he was "trying to keep [Grimes'] mom out . . . of it," Grimes responded, "[W]e're trying to do the same thing . . . ." Where there was no threat by Kult to arrest Grimes' mother if Grimes did not confess, nor a statement that Grimes' mother would not be arrested if he did confess, Grimes' confession was clearly motivated by his desire to protect his mother. Thus, the factual situation presented in the instant case is most similar to those cases where the defendant's primary motive was to protect a third

party. See *People v. Abbott, supra* (defendant's confession was voluntary where defendant's principal motive was exoneration of another person suspected of complicity in offense and officers offered defendant no bargain and had not threatened to prosecute third party if defendant refused to make statement). "The fact that an accused undertakes to shoulder the entire burden in order to exculpate someone else does not, of itself, render his confession involuntary and invalid." *Vogt v. United States*, 156 F.2d 308, 312 (5th Cir. 1946).

Further, under a totality of the circumstances analysis, we consider that Grimes had a previous history with the police, he has a diploma through the GED program, and he agreed to talk with Kult after being advised of his *Miranda* rights. He was interviewed in a standard interrogation room, the interview lasted about 20 minutes, and Grimes was in the interview room for a total of about 1 hour. Grimes was allowed to use the restroom during the interview and was given water. The video of the interrogation showed that Grimes was aware of why he was in the room and that he was trying to get information from Kult. The atmosphere of the interrogation was conversational, not confrontational. All of these factors indicate that the interrogation techniques used by Kult were not so coercive as to overbear Grimes' will, see *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013), and that Grimes' confession was made voluntarily.

## VI. CONCLUSION

After considering the totality of the circumstances, we conclude that Grimes' statements were voluntary and, thus, were properly admissible at trial. Consequently, we affirm his conviction and sentence.

AFFIRMED.